**UNITED STATES**

v.

**Senior Airman Mark A. CORRALEZ.**

**ACM 35415.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 20 Sept. 2002.

Decided 31 Aug. 2005.

Appellate Counsel for Appellant: Colonel Beverly B. Knott, Major Terry L. McElyea, and Major L. Martin Powell.

Appellate Counsel for the United States: Colonel LeEllen Coacher, Lieutenant Colonel Robert V. Combs, Major Michelle M. McCluer, and Major Kevin P. Stiens.

Before MALLOY, Senior Judge, JOHNSON, and GRANT, Appellate Military Judges.

## OPINION OF THE COURT

MALLOY, Senior Judge:

This case involves a sordid tale of domestic violence committed against two women with whom the appellant had a romantic relationship at the time of each respective offense. The myriad offenses arise out of the appellant's violent behavior toward these two young women, SS and MR, while under the influence of alcohol. He was convicted by a general court-martial, consistent with his pleas, of violating a lawful order (2 specifications), aggravated assault (2 specifications), assault consummated by a battery (16 specifications), kidnapping (3 specifications), communicating a threat (2 specifications), and breaking restriction (1 specification) in violation of Articles 92, 128, and 134, UCMJ, 10 U.S.C. §§ 892, 928, 934. He was found not guilty of the remaining specifications consisting of two specifications of assault, one specification of kidnapping, and one specification of communicating a threat charged as violations of Articles 128 and 134, UCMJ. A military judge sitting alone sentenced him to a dishonorable discharge, confinement for 4 years, and reduction to E–1. The convening authority approved the sentence as adjudged, and the case is now before this Court for mandatory review under Article 66, UCMJ, 10 U.S.C. § 866.

The appellant raises three assignments of error: (1) Whether his pleas to the two aggravated assaults (Specifications 1 and 2 of Charge I) and to two of the kidnapping specifications (Specification 1 of Charge II and Specification 1 of Additional Charge II) were improvident; (2) Whether he is entitled to credit for seven days of pretrial confinement because the government miscalculated his time in pretrial confinement; and (3) Whether the military judge erred in not dismissing Specification 2 of Second Additional Charge II (assault upon MR) as an unreasonable multiplication of charges.

The government concedes that the appellant is entitled to an additional seven days of pretrial confinement credit. In light of this concession, we will award the requested credit.

We find that the appellant's guilty pleas to the two aggravated assaults against SS on 17 May 2001 were provident. The military judge's mistakes in explaining the elements of aggravated assault did not render the appellant's guilty plea improvident to those offenses, and he was not obligated to advise the appellant that voluntary intoxication was a possible defense to the offense of kidnapping. But we find a substantial basis in law and fact to question the appellant's guilty pleas to kidnapping MR and, accordingly, set aside Specifications 1 and 2 of Additional Charge II. In light of these findings, we need not address the appellant's claim that there was an unreasonable multiplication of charges.

## I. Aggravated Assaults

### A. Background

In May 2001, the appellant and SS, a female member of the appellant's squadron, were in a romantic relationship and lived together in an apartment in Las Vegas, Nevada. On the evening of 17 May 2001, they went out for an uneventful dinner with friends at a local restaurant. While there, the appellant drank three or four 23-ounce beers over approximately a four-hour period. Upon departing the restaurant, the appellant drove the couple back to their apartment without incident or obvious impairment. They did not argue on their way home and SS had no reason to suspect that anything was amiss until they reached the apartment.

After arriving at their apartment, the appellant unexpectedly told SS that she could not stay there and refused to allow her to enter. SS asked the appellant for her Air Force battle dress uniform and car keys. The appellant threw the uniform out the front door but refused to give her the car keys. Almost immediately, however, he changed his mind about her leaving and invited her to enter the apartment. Once SS was inside, the appellant began a series of violent assaults against her lasting more than two and a half hours and ending only after a concerned neighbor, Mr. Michael Maciolek, placed a 911 call to the Las Vegas police.

Mr. Maciolek lived with his family next door to the appellant and SS and became concerned that something was wrong when his young daughter awoke screaming in the night as a result of loud noises coming from next door. Mr. Maciolek then heard body slams against the wall and screams for help coming from the appellant's apartment. He described these screams as "horrifying" and "terrifying." At one point, he observed SS attempting to flee the apartment by crawling out the front door on her hands and knees naked, only to have the appellant drag her by the hair back inside.

SS explained in her testimony that she was naked at the time Mr. Maciolek saw her because the appellant had forced her to remove all of her clothes to prevent her from escaping. She, too, described how the appellant pulled her back into the apartment by her hair. Photographs of her head admitted at trial revealed significant hair loss and injury to her scalp.

The Las Vegas police treated Mr. Maciolek's 911 call as a serious domestic violence situation requiring an immediate response. Officer Scott Murray was the first police officer to arrive at the apartment and testified during the sentencing phase of the trial. When Officer Murray knocked at the front door, the appellant answered with blood shot eyes and the odor of alcohol on his breath. He told Officer Murray that he had been drinking, but otherwise appeared calm and friendly and answered Officer Murray's questions appropriately. He explained that he and SS had argued, but "everything was okay and that the police were not needed." He attempted to block Officer Murray from entering the apartment and told him "there was no problem" and "they didn't need the police." Suspecting otherwise, Officer Murray pushed the appellant out of the way and entered the apartment to do a welfare check. At that point, the appellant turned hostile and began arguing with the police. At the same time, he called to SS in an effort to get her attention before the officers found her.

Officer Murray found SS in the bedroom "sitting on the end of the bed crying hysterically." She appeared to be extremely scared and had visible injuries on her body, including "deep teeth impressions" on one hand. In due course, the police photographed her

injuries. These photographs reveal two large bite marks on her right breast, a cigarette burn on her arm, various abrasions on her body, ligature marks on her neck, and injury to her scalp resulting from having her hair pulled from her head.

During the course of the evening, SS had been subjected to a number of assaults including two that were aggravated. The first aggravated assault occurred after the appellant broke a glass candleholder. After retrieving a shard of broken glass, he held it to SS's face while telling her "don't think I won't cut your pretty face." After directing her to remove her clothes, he intentionally burned her arm with a cigarette and ordered her into the bedroom, stating it was time for them to go to bed. After SS complied with his order to lie upon the bed, the appellant briefly left the room to retrieve a kitchen knife and a purse strap. Upon returning, and while straddling SS's chest, he ordered her to lift her head up and placed it in a noose that he had formed with the purse strap. He then began choking her with the strap and, at the same time, either hitting or poking her on the head with the kitchen knife, while telling her not to attempt to flee the apartment while he slept. He then bit her on the right breast, forearms, and hands.

As a result of these offenses, the appellant was charged with two specifications of aggravated assault—one involving a consummated battery with a knife, and the other involving an offer to cut SS's face with a piece of broken glass. He was also charged with 10 specifications of assault consummated by a battery, one specification of kidnapping, and one specification of communicating a threat.

### B. Providence Inquiry

After advising the appellant of his rights and having trial counsel place him under oath, the military judge began the providence inquiry with the two aggravated assaults against SS. He started his inquiry with the assault involving the use of the kitchen knife in the bedroom. He advised the appellant that the elements and definitions of this aggravated assault were as follows:

First, that at or near Las Vegas, Nevada, on or about 17 May 2001, you did bodily harm to [SS];

Second, that you did so with a certain dangerous weapon, a knife, by striking her on the head with the knife; and

Third, that the bodily harm was done with unlawful force or violence.

An act of force or violence is unlawful if done without legal justification or excuse and without the lawful consent of the victim.

A weapon is likely to produce death or grievous bodily harm when the natural and probable results of its particular use would be death or grievous bodily harm, although this may not be the use to which the object is ordinarily put. It's not necessary that death or grievous bodily harm actually result.

Grievous bodily harm does not mean minor injuries such as a black eye or bloody nose, but does mean fractured or dislocated bones, deep cuts, torn members of the body, serious damage to internal organs or other serious bodily injuries. Light pain, minor wounds and temporary impairment of some organ of the body do not ordinarily, individually or collectively establish grievous bodily harm. These results are common in most ordinary assault and battery cases.

In making a determination of whether grievous bodily harm resulted, the absence or presence of the extent of the injury and its adverse [e]ffects, degree of pain and suffering, length and degree of unconsciousness or amount of force and violence used, interference with normal activities, will be taken into consideration.

After hearing this explanation, the appellant told the military judge that, although he did not "really remember anything that happened that night," he had reviewed the police report and photographs, and believed that he had held a knife to SS's head without legal justification or her consent. He then stated: "I do believe holding a knife to someone's head may produce grievous bodily harm." After conferring with counsel, the appellant revised his statement concerning his lack of recall, acknowledging that there were "some things" that he did remember from the evening, and it was only "bits and pieces" of the

events that he did not recall. After a brief discussion with trial counsel as to whether there was a need to proceed further, the military judge turned to the second aggravated assault involving the threat to cut SS's face with the broken glass.

The military judge's discussion of this assault was substantially the same as above, except that he modified his explanation of the first three elements of the offense to reflect an offer-type aggravated assault. And again, he explained the circumstances under which the use of a weapon, means, or force is likely to produce death or grievous bodily harm. Thereafter, the military judge and the appellant engaged in the following dialogue:

MJ: Go ahead and tell me in your own words what happened with respect to Specification 2 of Charge I.

ACC: Your honor, I don't specifically remember holding glass to her face or threatening to cut her face, but I have seen the photographs, I've read her statements, and I believe I held the glass to her face and threatened to cut her. I don't believe I had any legal reason to hold glass to her face. I don't believe she consented to the conduct. I believe holding broken glass to someone's face may produce grievous bodily harm as well.

MJ: And once again, that's grievous bodily harm as I just defined that for you, right?

ACC: Yes, sir.

MJ: Okay. Now, once again, I'll ask the same questions that I asked with respect to Specification 1. You've had a chance to review the reports of investigation in this case?

ACC: Yes, Your Honor.

MJ: And you were present at the Article 32 hearing,[1] and you saw the evidence that the government had?

ACC: Yes, sir.

MJ: And based on all that and the knowledge you do have, you are, in fact, convinced that you are guilty of the offense alleged in Specification 2 of Charge I?

ACC: Yes, sir.

MJ: Do you have any questions at all about that?

ACC: No, sir.

MJ: Trial counsel?

ATC: No need for any further questions on this, Your Honor.

## C. Discussion

The requirements for accepting a guilty plea in the military justice system have long been established by statute, case law, and the *Manual for Courts-Martial.* The military judge must establish on the record that the guilty pleas are knowingly made, voluntary, and factually based. Rule for Courts-Martial (R.C.M.) 910. *See United States v. McCrimmon,* 60 M.J. 145, 152 (C.A.A.F.2004). This important task is accomplished by conducting a thorough inquiry of the accused under oath before accepting the pleas. As part of this process, the military judge must accurately inform the accused of the elements of the offense. *United States v. Negron,* 60 M.J. 136, 141 (C.A.A.F. 2004). "An essential aspect of informing [the appellant] of the nature of the offense is a correct definition of legal concepts." *Id.* The accused must then explain in his or her own words what he did or what he did not do, and what he intended. *United States v. Care,* 40 C.M.R. 247, 1969 WL 6059 (C.M.A.1969). When, as here, an accused cannot recall all of the circumstances surrounding his crimes, he may still plead guilty so long as he or she is personally convinced of his guilt and is willing to admit that guilt to the military judge. *United States v. Moglia,* 3 M.J. 216, 218 (C.M.A.1977). *See also United States v. Barreto,* 57 M.J. 127 (C.A.A.F.2002) (holding amnesia did not preclude a provident guilty plea).

We review a military judge's decision to accept a plea of guilty for abuse of discretion. *United States v. Eberle,* 44 M.J. 374, 375 (C.A.A.F.1996). We will not find an abuse of discretion unless the record reveals "a 'substantial basis' in law and fact" for questioning the pleas. *United States v. Prater,* 32 M.J. 433, 436 (C.M.A.1991). Our determination of whether there is a substantial

1.  10 U.S.C. § 832.

basis in law and fact to question a guilty plea is based on review of the entire record. *Negron,* 60 M.J. at 141. If the entire record supports the factual basis for the plea and demonstrates that the appellant understood the elements of the offenses, we may affirm the findings even if the military judge erred in stating a legal concept. *United States v. Jones,* 34 M.J. 270, 272 (C.M.A.1992). The mere possibility of a defense does not provide a substantial basis in law and fact to question a guilty plea on appeal. *United States v. Crutcher,* 49 M.J. 236, 239–40 (C.A.A.F.1998).

The appellant has a two-pronged attack on his guilty pleas to the aggravated assault specifications involving SS. First, he argues that they were improvident because the military judge failed to completely define the elements of aggravated assault before discussing the offenses with him. Second, he argues that his statements during the providence inquiry ("holding a knife to someone's head *may* produce grievous bodily harm" and "holding broken glass to someone's face *may* produce grievous bodily harm") are insufficient to acknowledge his guilt to the offense because they evince only a possibility, not a probability, that his actions could have produced death or grievous bodily harm to SS. Neither argument is persuasive.

■ We begin by noting that the offense of aggravated assault actually has four elements, not three as the military judge told the appellant. They are:

(i) That the accused attempted to do, offered to do, or did bodily harm to a certain person;

(ii) That the accused did so with a certain weapon, means, or force;

(iii) That the attempt, offer, or bodily harm was done with unlawful force or violence; and

(iv) That the weapon, means, or force was used in a manner likely to produce death or grievous bodily harm.

*Manual for Courts–Martial, United States (MCM),* Part IV, ¶ 54b(4)(a) (2002 ed.). Inexplicably, the military judge twice missed the fourth element when informing the appellant of the elements of the offense. This, of course, was error. *United States v. Redlinski,* 58 M.J. 117, 119 (C.A.A.F.2003). But it was not reversible error under the circumstances of this case.

Based on our review of the entire plea colloquy, we are convinced that the military judge's mistake does not provide a substantial basis in law and fact to question the appellant's guilty pleas to the aggravated assaults against SS. *See Jones,* 34 M.J. at 272. The appellant was fully and accurately informed of the concept of grievous bodily harm. The military judge correctly explained the fourth element of aggravated assault despite not listing it first for him as an element. Indeed, by the time he questioned the appellant about his misconduct, he had not only fully and correctly explained the concept of grievous bodily harm, but also the circumstances under which the use of a weapon, means, or force is likely to result in death or grievous bodily harm.

After hearing these legally correct definitions, the appellant acknowledged that holding a knife to SS's head and offering to cut her face with a piece of broken glass was conduct that met these definitions. It is clear to us from the entire colloquy that the appellant understood all of the elements of the offense, despite the military judge's initial failure to explicitly list the fourth element of the offense for the appellant.

■ We also reject the appellant's assertion that his use of the word "may" vitiated his guilty pleas to these aggravated assault specifications. The phrase "used in a manner likely to produce death or grievous bodily harm" means more than a mere possibility that death or such harm will occur. Death or grievous bodily harm must be the "natural and probable consequence" before it can be said that the use of a weapon, means, or force was likely to cause death or grievous bodily injury. *MCM,* Part IV, ¶ 54c(4)(a)(ii); *United States v. Outhier,* 45 M.J. 326, 329 (C.A.A.F.1996). The appellant's use of the word "may" is less than precise in the abstract. Nevertheless, we are unwilling to parse his words or tear them from their contextual moorings to arrive at the conclusion he suggests. It is clear from the exchange between the military judge and the

appellant that he understood death or grievous bodily harm were the natural and probable consequences of placing a knife to SS's head and threatening to cut her face with broken glass. We find this particularly compelling in the context of his extreme brutality toward SS and the extended period of time over which it occurred. Given the manner in which the appellant admitted using them, both the knife and the broken glass were dangerous weapons that clearly made death or grievous bodily harm to SS more than a theoretical possibility. *See United States v. Moore*, 846 F.2d 1163, 1166 (8th Cir.1988) (holding that many objects have the capacity to inflict great bodily harm, it is how they are used that makes them dangerous weapons). *See also United States v. Dearing*, 60 M.J. 892, 900 (N.M.Ct.Crim.App.2005) (citing *United States v. Regalado*, 33 C.M.R. 12, 16, 1963 WL 4805 (C.M.A.1963) (stabbing a person with a knife is deadly force)). We, therefore, hold that the record of trial objectively establishes that the appellant knew the elements of aggravated assault, that he voluntarily admitted that his conduct met those elements, and that he pleaded guilty because he believed that he was, in fact, guilty. *Jones*, 34 M.J. at 272; Article 45(a), UCMJ, 10 U.S.C. § 845(a).

## II. Kidnapping of SS

### A. Background

▉ The appellant pleaded guilty to one specification of kidnapping SS by confining and holding her during the previously-described incident. Unlike the assault offenses, the appellant had no difficulty or reticence describing the circumstances of this offense to the military judge. After being advised of the elements of kidnapping, he explained that when SS tried to escape the apartment, he "ran after her ... picked her up and carried her back in," and thereafter continued to hold her in the apartment until the police arrived.[2]

The military judge did not specifically discuss with the appellant whether voluntary intoxication was a defense to kidnapping. Nonetheless, the issue was addressed and properly resolved. During the course of discussing the aggravated assaults against SS, trial counsel expressed the concern that voluntary intoxication could be used to attack the appellant's guilty pleas on appeal if not addressed by the military judge. Thereafter, the military judge broached the subject with both trial defense counsel and the appellant. Defense counsel responded by assuring the military judge that "the defense understands and believes and has fully advised [the appellant] that voluntary intoxication is not a legal defense to any of the charges he faces." The appellant advised the military judge that this was correct. Despite this assurance, the appellant now challenges the providence of his plea to kidnapping SS because the military judge failed to specifically address the possibility that voluntary intoxication was a defense to kidnapping.

### B. Discussion

The appellant acknowledges that voluntary intoxication is generally not a defense under military law. *See* R.C.M. 916(*l*)(2). He asserts, however, that kidnapping, unlike assault, is a specific intent crime because it must be committed "willfully," and, thus, voluntary intoxication was an available defense to the kidnapping of SS. Accordingly, he argues the military judge erred by not informing him of this possible defense.

Although we agree with the appellant that kidnapping must be committed willfully, this begs the question whether it is a general or specific intent crime. Other than the *Manual's* definition of "willfully," the appellant cites no authority for his assertion that kidnapping is a specific intent crime. His conclusion does not withstand careful analysis for the reasons set forth below. Voluntary intoxication is not a legal defense to kidnapping because it is a general intent crime.

---

2. The appellant was charged with kidnapping SS by confining her. It appears from the record and from the issue raised on appeal that the appellant believed that movement or "carrying away" of SS was an essential element of kidnapping. In our opinion, this is an erroneous view of the law. The kidnapping was complete long before he forcibly dragged SS back into the apartment.

Although kidnapping is not a crime specifically enumerated in the Uniform Code of Military Justice it is prosecutable under Article 134, UCMJ, on one of three theories: (1) a violation of state law assimilated under clause 3; (2) a violation of the federal kidnapping act, 18 U.S.C. § 1201(a), incorporated under clause 3; or (3) as conduct prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces under the general clauses. *United States v. Jeffress*, 28 M.J. 409, 411 (C.M.A.1989). Here, the appellant was charged with the offense under the general clauses.

The President has defined kidnapping as follows:

(1) That the accused seized, confined, inveigled, decoyed, or carried away a certain person;

(2) That the accused then held such person against that person's will;

(3) That the accused did so willfully and wrongfully; and

(4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*MCM*, Part IV, ¶ 92b. The five ways that kidnapping can be committed under the *Manual*—seize, confine, inveigle, decoy, or carry away—are taken from the federal kidnapping act, 18 U.S.C. § 1201(a), and are generally given the same meaning as the federal statute. *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A.1991); *see generally United States v. Williams*, 17 M.J. 207, 216 (C.M.A.1984); *MCM*, A23–21 (noting that the *Manual's* definition is based generally on 18 U.S.C. § 1201). "Willfully" means that the appellant must have "specifically intended" to hold SS against her will after confining her in their apartment and is the term in issue here. *MCM*, Part IV, ¶ 92c(4).

We do not share the appellant's view that the use of the phrase "specifically intended" to define "willfully" necessarily impels the conclusion that the President intended to make kidnapping a specific intent crime. More is required given the traditional view of the meaning of "willfully" when used to define criminal intent and in light of the common law presumption favoring general intent crimes. *See United States v. DeAndino*, 958 F.2d 146, 148 (6th Cir.1992) (if a criminal statute does not specify intent then general intent is presumed to be the requirement). *See also Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). This presumption is based on "the venerable principle that ignorance of the law generally is no defense to a criminal charge." *Ratzlaf v. United States*, 510 U.S. 135, 149, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

The difference between a general intent crime and a specific intent crime is that the former requires that the accused must have intentionally engaged in the prohibited conduct and not by mistake or accident. The latter requires that the accused must have acted with the specific purpose of violating the law. *United States v. Gonyea*, 140 F.3d 649, 653 (6th Cir.1998). " '[W]illfully' refers to consciousness of the act but not to consciousness that the act is unlawful." *Cheek*, 498 U.S. at 209, 111 S.Ct. 604 (Scalia, J., concurring).

The word "willfully," though capable of creating a specific intent requirement, is most commonly used to express a requirement for general intent. *United States v. Phillips*, 19 F.3d 1565 (11th Cir.1994). The court in *Phillips* discussed the meaning of the word when used in federal criminal statutes to express intent. Phillips, who was convicted of violating the criminal sanctions of the Labor Management Relations Act, 18 U.S.C. § 186, argued on appeal that the trial judge had incorrectly concluded that the word "willfully" created a general intent crime and erred in instructing the jury accordingly. The court of appeals held that the trial judge had correctly determined that this statutory term created a general intent crime and affirmed. Although recognizing that the word "willfully" is susceptible of other meanings, and can in some instances create a specific intent crime, the court noted that the traditional common law view is that willfully requires "a finding of only general intent." *Phillips*, 19 F.3d at 1581. Other courts have reached the same conclusion when examining other federal crimes where the word "willfully" is used to define the required criminal

intent. *See United States v. Johnson,* 14 F.3d 766, 768 (2d Cir.1994) (willfully threatening the President in violation of 18 U.S.C. § 871 is a general intent crime); *United States v. Barber,* 594 F.2d 1242, 1244 (9th Cir.1979) (willfulness is a rudimentary mental element and means the defendant intentionally did the acts charged); *United States v. Acevedo–Velez,* 17 M.J. 1 (C.M.A.1983) ("willfully and maliciously" did not make arson a specific intent crime, overruling *United States v. Greene,* 43 C.M.R. 137, 1971 WL 12742 (C.M.A.1971), which held that arson was a specific intent crime and the law officer erred by not instructing that voluntary intoxication was a defense to the offense).

Nothing in the *Manual's* use of the word "willfully" to define the mental element of kidnapping, suggests that it was "carving out an exception to the traditional rule." *Cheek,* 498 U.S. at 200, 111 S.Ct. 604. Indeed, the *Manual's* definition of "willfully" (the "accused must have specifically intended to hold the victim against the victim's will") is consistent with the general intent notion of intentionally doing an act that the law makes illegal. *MCM,* Part IV, ¶ 92c(4). It is not consistent with the specific intent requirement of specifically knowing that the conduct is unlawful. The phrase "specifically intended" to hold the victim, in our view, is not synonymous with specific intent to violate the law of kidnapping.

We find further support for this conclusion in the federal analogue to the military definition of kidnapping found in 18 U.S.C. § 1201(a). Neither the federal statutory definition of kidnapping nor the case law interpreting that definition suggests a congressional intent to make specific intent an element of kidnapping. Under the present iteration of § 1201(a) there are seven ways to commit kidnapping and five ways to establish federal jurisdiction. The word "willfully" appears only in § 1201(a)(1) and

defines not the substantive offense of kidnapping but one of five bases for federal jurisdiction.[3] *See United States v. Horton,* 321 F.3d 476, 479–80 (4th Cir.2003) (citing *United States v. Wills,* 234 F.3d 174, 176 (4th Cir.2000) ("interstate transportation of the victim became 'merely a basis for federal jurisdiction, rather than an integral part of the substantive crime' ")), *cert. denied,* 540 U.S. 839, 124 S.Ct. 98, 157 L.Ed.2d 71 (2003).

Two federal cases have addressed the issue of whether the present kidnapping statute creates a general or specific intent crime. In both cases, the issue arose in the same context as here, namely, whether the defenses of diminished capacity or voluntary intoxication were available in a kidnapping prosecution. In *United States v. Sneezer,* 983 F.2d 920 (9th Cir.1992), the appellant was convicted of aggravated sexual assault and kidnapping of a female hitchhiker charged under § 1201(a)(2). One of the issues on appeal was whether the trial judge erred in refusing to give a voluntary intoxication instruction based on the court's ruling that kidnapping is a general intent crime. As in the military justice system, voluntary intoxication may be a defense to a specific intent crime, but is not a defense to a general intent crime. *Id.* at 922. Accordingly, the court held that "kidnapping is a general intent crime" and thus, the defense was not available, and explained its rationale thusly:

> Some cases in this and other circuits have stated that § 1201(a) includes the "knowing and willful" kidnapping as an element. However, these cases are inapposite because they were based on interpretations of an earlier version of § 1201(a). In 1972, the statute was amended to remove the word "knowingly" from the statute and to make subsections (1) and (2) two separate bases for making kidnapping a federal

---

**3.** In 1972, Congress amended § 1201(a) by removing reference to the knowing transportation of a victim in interstate or foreign commerce from kidnapping's substantive definition. The word "willfully" was substituted for "knowingly" and the requirement for a willful movement of the victim in interstate or foreign commerce became one of five bases for federal jurisdiction "rather than an integral part of the substantive

crime." *United States v. Wills,* 234 F.3d 174, 176 (4th Cir.2000). Prior to 1972, § 1201(a) read, in part: "Whoever knowingly transports in interstate or foreign commerce, *any person who has been* unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away ..." *See also United States v. Hughes,* 716 F.2d 234, 237 n. 6 (4th Cir.1983).

crime, with the word "willful" appearing only in subsection (1). We believe that the removal of the word knowingly and the placement of "willfully" only in subsection (a)(1) indicates that Congress intended subsection (a)(2) to be a general intent crime. The cases that refer to § 1201(a) as a specific intent crime do not address the fact that the statute has changed.

*Id.* at 923 (citations omitted).

In *United States v. Jackson,* 248 F.3d 1028 (10th Cir.2001), the appellant had been convicted of kidnapping by taking seven postal employees hostage in violation of 18 U.S.C. § 1201(a)(5).[4] On appeal, he argued that the trial court erred in relying on *Sneezer* to rule that evidence of his diminished capacity was inadmissible because kidnapping under that section is also a general intent crime and that the defense of diminished capacity, like the defense of involuntary intoxication, is not a defense to a general intent crime. *Jackson,* 248 F.3d at 1031. The appellant argued that the trial court should have relied not on *Sneezer* but on *Chatwin v. United States,* 326 U.S. 455, 66 S.Ct. 233, 90 L.Ed. 198 (1946) instead. In *Chatwin,* the Supreme Court stated that kidnapping requires "unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." *Chatwin,* 326 U.S. at 460, 66 S.Ct. 233.

The court of appeals rejected this argument, noting that § 1201(a)(5) does not express any required intent and, therefore, should be presumed to require only that the appellant knew the facts that made his conduct illegal. *Jackson,* 248 F.3d at 1032. In reaching this conclusion, the court noted a couple of points relevant to our inquiry. First, it noted the word "willfully" does not usually signal a specific intent requirement. *Id.* at 1031 n. 2 (citing *Phillips,* 19 F.3d at 1576–78). Thus, even if it applied *Chatwin's* "willful intent to confine the victim" lan-

guage, this would still be consistent with a requirement for general intent. As the court noted: "A 'willful intent to confine the victim' means that the perpetrator intended to do the things he did, which were proscribed by law. It does not mean that he acted to confine his victim or victims knowing such confinement was against the law." *Jackson,* 248 F.3d at 1031.

In reaching the conclusion that kidnapping was a general intent crime and that neither the defense of diminished capacity nor the defense of voluntary intoxication were available, both the *Sneezer* and *Jackson* courts were interpreting specific sections of the federal statute. Left unanswered by their discussions is whether their interpretation would apply to subsection (a)(1) where Congress specifically used the word "willfully."[5]

In a later decision, the Tenth Circuit suggested the requirement that a kidnapping be done "knowingly and willfully" is unique to subsection (a)(1) and "may require specific intent" when charged under that section. *United States v. Gabaldon,* 389 F.3d 1090, 1095 n. 1 (10th Cir.2004), *cert. denied,* — U.S. —, 125 S.Ct. 1688, 161 L.Ed.2d 482 (2005). *See also United States v. Walker,* 137 F.3d 1217 (10th Cir.1998).

We do not agree with the Tenth Circuit's suggestion that the intent element for kidnapping hinges on the jurisdictional subsection under which it is charged for two reasons. First, subsections (a)(1)-(5) do not define the substantive elements of kidnapping. They are simply jurisdictional pegs and not separate crimes. *See* 2–4 *Modern Federal Jury Instruction–Criminal* P. 42.01, Form Instruction 42–1 (2004). Section 1201(a) defines what is criminal and the crime of kidnapping is complete when this definition is met. Subsections (a)(1)-(5) define when this criminal conduct is of federal

---

4. 18 U.S.C. § 1201(a)(5) is a jurisdictional element and makes kidnapping of certain officers and employees of the United States a federal offense. It states: "the person is among those officers and employees described in section 1114 of this title and any such act against the person is done while the person is engaged in, or on account of, the performance of official duties[.]"

5. Subsection (a)(1) provides: "the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary if the person was alive when the transportation began[.]" 18 U.S.C. § 1201(a)(1).

concern.[6] As the district court in *Jackson* noted, comparing the language of these jurisdictional subsections may be useful in discerning the different requirements for federal jurisdiction under the statute but it sheds no ·light on the mens rea required for the substantive elements in § 1201(a). *United States v. Jackson*, 8 F.Supp.2d 1239, 1243 (D.Colo.1998), *aff'd*, 248 F.3d 1028 (10th Cir.2001). It does not make sense to conclude that the question whether § 1201(a) requires specific or general intent turns on the circumstances that establish federal jurisdiction. Second, we do not agree with the suggestion that a knowing and willful intent is unique to § 1201(a)(1). The fact that the term "willfully" does not expressly appear in § 1201(a)'s definition of kidnapping does not mean that the observation in *Chatwin* that kidnapping requires "a willful intent" to "confine the victim" has been overcome by statutory changes made since that decision. *Chatwin*, 326 U.S. at 460, 66 S.Ct. 233. Kidnapping is a crime rooted in the common law,[7] and it can, therefore, be presumed that it requires both "a wrongful act" and "a criminal intention" even in the face of statutory silence. *Morissette v. United States*, 342 U.S. 246, 274, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Willfulness is a rudimentary expression of general intent and can be implied as the required "criminal intention," like the Court did in *Chatwin*, even if it is not expressly stated in the statute. *Id.; see also Blocker*, 32 M.J. at 281 (noting that knowingly and willfully is the actus reus under the federal kidnapping statute).[8]

Because of the close similarities between the federal and military definitions of kidnapping, we conclude that they share the same intent element requirement, and that the term "willfully" should be given its common law meaning. In this context, we believe " 'willfully' refers to consciousness of the act

but not to consciousness that the act is unlawful." *Cheek*, 498 U.S. at 209, 111 S.Ct. 604 (Scalia, J., concurring); *cf. Acevedo–Velez*, 17 M.J. at 1. The providence inquiry clearly supports the conclusion that the appellant knew the facts that made his conduct unlawful, notwithstanding the fact that he had been drinking earlier in the evening. We do not find a substantial basis in law or fact to question those pleas.

### III. Kidnapping of MR

#### A. Background

SS was not the only woman the appellant was charged with kidnapping. Sometime after his relationship with SS ended, he began a new relationship with MR to whom he was married to by the time of trial. Unfortunately, this relationship, too, was marked by episodes of domestic violence after the appellant had been drinking. Among other offenses involving MR, the appellant pleaded guilty to kidnapping her on two occasions, once as they sat in their parked car in front of the home of his relatives, and once as they briefly argued in their apartment.

The first of these kidnappings occurred on 23 May 2002 while the appellant and MR were visiting his relatives in Texas. While returning to his relatives' house, the appellant—again under the influence of alcohol— became lost and began arguing with MR as they attempted to find their destination. Their argument continued after the appellant parked the vehicle at his relatives' house and soon turned to physical abuse. While sitting in the parked vehicle, the appellant struck MR in the face, pulled her hair, hit her on the leg, bit her hand, and choked her. When she attempted to exit the vehicle, he prevented her from doing so for about five minutes by holding her seatbelt in the locked position.

**6.** A jurisdictional "peg" allows federal prosecution consistent with the Commerce Clause of the United States Constitution. U.S. CONST. art. I § 8, cl. 3. *United States v. McCoy*, 323 F.3d 1114, 1124 (9th Cir.2003) (citing *United States v. Rodia*, 194 F.3d 465, 471 (3d Cir.1999) ("jurisdictional hooks:" a "provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction

in connection with any individual application of the statute")).

**7.** 2 *Wharton's Criminal Law* § 210 (14th ed.1979).

**8.** The Tenth Circuit has read *Blocker* to be consistent with their conclusion that this is language of general intent. *Jackson*, 248 F.3d at 1031.

The second kidnapping occurred on 7 June 2002 shortly after the couple moved into their new apartment. Once again, they got into an argument after the appellant "had a few beers." During the course of this argument, the appellant pushed MR from room to room and prevented her from leaving the apartment for about five minutes. After five or ten minutes the fight was over, and MR changed her mind about leaving and went to bed.

### B. Discussion

The appellant claims that his plea to kidnapping MR (Specification 1 of Additional Charge II) cannot stand because he failed to admit that he "carried [her] away" after he briefly held her in their automobile while they argued and he assaulted her. The appellant believes that movement of the victim is an essential element of kidnapping. His belief is wrong.

■ While the appellant's position is consistent with the common law definition of kidnapping and the federal definition of the offense as it existed prior to 1972, it does not reflect the present federal or military definitions of the offense. *See Wills,* 346 F.3d at 486 (kidnapping "does not require that the defendant accompany, physically transport, or provide for the physical transportation of the victim"); *United States v. Young,* 512 F.2d 321, 323 (4th Cir.1975) ("Congress has made unlawful much more than strict kidnapping as defined at common law"); *United States v. Etsitty,* 140 F.3d 1274 (9th Cir.1998) (asporation of the victim is required as a jurisdictional predicate only under subsection of (a)(1) of the statute). Involuntary seizure and detention—not movement—is the essence of kidnapping by confinement. *United States v. Carrion–Caliz,* 944 F.2d 220, 223 (5th Cir.1991); *see e.g., Chatwin,* 326 U.S. at 464, 66 S.Ct. 233. While "carrying away" the victim may be the most familiar form of kidnapping it is no longer the only form of the offense. A person who seizes and confines another against their will for an appreciable period of time can be convicted of kidnapping even if there is no movement of the victim. *See generally Jackson,* 248 F.3d at 1028 (hostage taking of federal employees).

■ Although we reject the appellant's argument as legally incorrect, we nonetheless have grave concerns about the use of kidnapping under these circumstances. Based on these concerns, we conclude that there is a substantial basis in law and fact to question both guilty pleas to kidnapping MR. We find that the brief holdings of MR in the couple's automobile and in their apartment were "merely incidental" to the five charged assault specifications stemming from these disputes and cannot support the far more serious offenses of kidnapping. *United States v. Newbold,* 45 M.J. 109, 112 (C.A.A.F. 1996). Turning these simple assaults, each punishable by a maximum of six months of confinement, into far more serious offenses, each punishable by confinement for life without eligibility for parole, reflects precisely the "careless concept of the crime" of kidnapping that has long been condemned as a misuse of the offense and sought to be avoided. *Chatwin,* 326 U.S. at 464, 66 S.Ct. 233. It is contrary to a long line of precedent, beginning with the Supreme Court's decision in *Chatwin,* seeking to restrict the otherwise long reach of broad statutory language defining the crime and prevent abusive prosecutions.[9] *See United States v. Howard,* 918 F.2d 1529 (11th Cir.1990) (limited and incidental detention during robbery was legally insufficient to support attempted kidnapping of federal agent); *Government of Virgin Islands v. Ventura,* 775 F.2d 92, 95 (3d Cir. 1985) (noting that examples of abusive prosecution for kidnapping are common.). *See also Etsitty,* 140 F.3d at 1275 (Klienfeld, C.J., concurring) ("Kidnapping, punishable by life imprisonment, is not committed whenever someone is held against their will, as when one person grabs another to do harm, and the victim says 'Let me go.' ").

The concern that "momentary or incidental detention" inherent in the commission of other crimes should not be used as the predicate for charging kidnapping as an additional of-

---

9. As the Court noted: "Were we to sanction a careless concept of the crime" of kidnapping "or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity." *Chatwin,* 326 U.S. at 464, 66 S.Ct. 233.

fense is also clearly expressed in the *Manual* and should have been heeded in this case. *MCM,* Part IV, ¶ 92c(2). Our superior court has developed a six-part test to guard against such abuse of the kidnapping offense. Factors considered are:

a. The occurrence of an unlawful seizure, confinement, inveigling, decoying, kidnapping, abduction or carrying away and a holding for a period. Both elements must be present.

b. The duration thereof. Is it appreciable or *de minimis?* This determination is relative and turns on the established facts.

c. Whether these actions occurred during the commission of a separate offense.

d. The character of the separate offense in terms of whether the detention/asportation is inherent in the commission of that kind of offense, at the place where the victim is first encountered, without regard to the particular plan devised by the criminal to commit it.

e. Whether the asportation/detention exceeded that inherent in the separate offense and, in the circumstances, evinced a voluntary and distinct intention to move/detain the victim beyond that necessary to commit the separate offense at the place where the victim was first encountered.

f. The existence of any significant additional risk to the victim beyond that inherent in the commission of the separate offense at the place where the victim is first encountered. It is immaterial that the additional harm is not planned by the criminal or that it does not involve the commission of another offense.

*United States v. Seay,* 60 M.J. 73, 80–81 (C.A.A.F.2004). *See also United States v. Santistevan,* 22 M.J. 538, 543 (N.M.C.M.R. 1986), *aff'd,* 25 M.J. 123 (C.M.A.1987).

Even in the context of the appellant's guilty pleas, we find that both charged kidnappings of MR fail this test by a wide margin. The first incident in May 2002 occurred while the couple sat and argued in their automobile in front of the appellant's relatives' home. During the course of this five-minute "kidnapping," the appellant assaulted MR by hitting, biting, choking, and pulling her hair. According to MR's testimony, she wanted to go into the house but the appellant "didn't want to take an argument into the home in front of all the family." To keep her from entering the house, he held her seatbelt for about five minutes until the argument was over.

The second so-called "kidnapping" occurred the next month after the couple moved into an apartment. They again argued and briefly assaulted each other. MR testified that she was wrestling with the appellant and hit him on the head with a table. During this fight the appellant prevented her from leaving the apartment and pushed her from room to room. This "kidnapping" ended after about five minutes when MR went to bed.

These offenses involve the functional equivalent of a feuding couple driving down the road. Kidnapping should not be used "as a club every time a boyfriend and girlfriend are driving down the highway arguing, one of them says 'let me out of this car right now,' and the driver keeps arguing instead of pulling onto the shoulder." *Etsitty,* 140 F.3d at 1275 (Kleinfeld, C.J., concurring). The appellant and MR argued and fought in their parked car and in their new apartment. At the conclusion of their fights, they went about their lives together. While we do not minimize the appellant's abusive misconduct, we cannot overlook judicial precedent clearly signaling disapproval of this type of overzealous prosecution. Here, we find that even if there were a confinement and holding of MR on either charged occasion, they (1) were not of an appreciable duration, (2) occurred during the commission of the charged assaults upon her, (3) were inherent in the commission of the assaults, (4) did not exceed the confinement and holding inherent in the assaults, and (5) did not expose her to significant additional risk beyond that already inherent in the assaults.

In our view, this was improper in light of clear guidance that condemns such charging. We find that there is a substantial basis in law and fact to question the appellant's guilty pleas to these two offenses. The military judge abused his discretion when he accepted

the appellant's guilty pleas to them because the appellant's conduct failed to legally and factually establish kidnapping. Given this conclusion, we believe it is appropriate for us to dismiss both Specifications 1 and 2 of Additional Charge II rather than authorize a rehearing.

### IV. Reassessment of Sentence

Having found the need to dismiss these two offenses, each of which carries the possible sentence of confinement for life without eligibility for parole, the question remains whether we can reassess the sentence consistent with the principles of *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990), and *United States v. Sales,* 22 M.J. 305 (C.M.A.1986). We believe that under the circumstances of this case we can. The dismissal of these two kidnapping specifications does not change the maximum sentence in the case. The appellant remains convicted of kidnapping SS and a host of other serious offenses, including two aggravated assaults. He was sentenced by a military judge and the facts concerning the dismissed kidnappings would have been before him since they were inherent in the assault specifications involving MR. Under these circumstances, we conclude that the sentence for the remaining offenses would have been of at least the same magnitude as the adjudged sentence of a dishonorable discharge, confinement for 4 years, and reduction to E–1.

### V. Conclusion

The approved findings of Specification 1 and 2 of Additional Charge II are set aside and dismissed. The appellant is awarded seven days of pretrial confinement credit. The findings, as modified, and the sentence, as reassessed, are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.