# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
POND, PENLAND, and MORRIS
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**First Sergeant STEVEN K. WILSON**
**United States Army, Appellant**

ARMY 20230233

Headquarters, Seventh Army Training Command
Thomas P. Hynes, Military Judge
Lieutenant Colonel Jeremy W. Steward, Staff Judge Advocate

For Appellant: Captain Amir R. Hamdoun, JA (argued); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Lieutenant Colonel Mitchell D. Herniak, JA; Captain Amir R. Hamdoun, JA (on brief and reply brief).

For Appellee: Major Chase C. Cleveland, JA (argued); Colonel Christopher B. Burgess, JA; Colonel Jacqueline J. DeGaine, JA; Major Chase C. Cleveland, JA (on brief).

5 August 2024

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

Per Curiam:

Where the gravamen of the case[1] is an alleged kidnapping based on fundamentally unprecedented facts, we heed the Supreme Court's admonition from

---

[1] Contrary to appellant's pleas, a military judge sitting as a special court-martial under Articles 16 and 19, Uniform Code of Military Justice, convicted him of one specification of kidnapping, one specification of assault consummated by a battery, one specification of communicating a threat, and one specification of provoking speech, in violation of Articles 125, 128, 115, and 117, Uniform Code of Military Justice, 10 U.S.C. §§ 925, 928, 915, and 917 [UCMJ], but sentenced him to no punishment.

*Chatwin v. United States,* interpreting the federal law[2] that prohibited interstate kidnapping:

> Were we to sanction a careless concept of the crime of kidnapping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity. A loose construction of the statutory language conceivably could lead to the punishment of anyone who induced another to leave his surroundings and do some innocent or illegal act of benefit to the former, state lines subsequently being traversed. The absurdity of such a result, with its attendant likelihood of unfair punishment and blackmail, is sufficient by itself to foreclose that construction.

36 U.S. 455, 464 (1946).

To be clear, this record does not suggest a "careless" approach to the case, however novel the charging decision might have been. Nonetheless, we shall affirm only appellant's conviction for assault consummated by a battery, because: the government's kidnapping case against appellant was factually insufficient, the military judge erred by denying production of a defense witness that was not harmless as to the communicating a threat and kidnapping offense, and appellant's convictions for provocative speech and gestures and threatening language were factually insufficient.[3] [4]

## BACKGROUND

Appellant was a senior noncommissioned officer (NCO) leader. On 19 October 2022, his elementary school-aged daughter was upset when he came home. She then tearfully explained that, during a flag football game that included adults and children, another senior NCO leader, ███████████████████, got

---

[2] We recognize the federal statute and the UCMJ statute are different. *See United States v. Jeffress,* 28 M.J. 409 (C.M.A. 1989).

[3] We have fully and fairly considered appellant's remaining matters under *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982) and find they warrant neither discussion nor relief.

[4] In 2022, Congress amended the Uniform Code of Military Justice to provide appellant and others similarly situated an avenue of direct appeal to this court. Without that legislation, we would lack authority to review this case. *See* Pub. L. No. 117-263, § 544, 136 Stat. 2582.

frustrated and angrily threw flags in her face.[5] Once confident his daughter was not physically injured, appellant angrily telephoned ███████ and then drove to his quarters.

Outside █████'s quarters, appellant berated him for making his daughter cry, and █████ testified appellant threatened him with physical harm. ███████ offered to apologize to appellant's daughter – claiming later at trial he did not know what he had done wrong[6] - and appellant told him to get in appellant's truck. ██████ ██ did so untouched, though he testified he had no choice:

Q. Did you feel like you had a choice?

A. No. I did not have a choice.

Q. Why not?

A. Because he was very aggressive, sir.

Q. What did you think would have happened if you had not gotten in the truck?

A. He probably would have attempted to fight it – fight me and we would have been fighting in the parking lot.

Q. And did you want that to happen?

A. No, I did not.

Q. So, when you got in the truck, where were you going?

A. We went to his apartment in Building O, sir.

...

Q. And, on the way over there, how is First Sergeant behaving?

A. He was just telling me, "Don't say a word. Shut the f--- up," and he kept flinching at me.

---

[5] There is no dispute that appellant sincerely believed ██████ threw the flags at his daughter, though the parties disagree whether █████ did so.

[6] He did not make this claim to appellant during their confrontation.

Q. When you say "he was flinching at you," could you again demonstrate that for the court?

A. As he was driving, he was going like this [demonstrating], "Don't say nothing."

Q. Okay. Let the record reflect: The witness, with his left hand, reached in front of him as if grabbing a steering wheel, and then reached out and lunged with his right hand with his fist balled. Did you say anything back?

A. I did not, sir.

Q. When you arrived, what did you do?

A. I got out of the truck. First Sergeant Wilson went first, and he told me, "You better f---ing apologize," and I went right behind him, sir.

Q. Now, at this point, could you have just walked away?

A. I could have.

Q. Why didn't you?

A. Because, more than likely, he was so enraged, he would have chased me down.

Q. Did you feel like you had a choice as to whether or not to walk away?

A. I did not, sir.

Q. You said he went up the stairs first. Did you follow him?

A. I did, sir.

SFC PK continued his rendition of the scene, testifying that he entered the quarters and saw appellant's children:

Q. And what were they like when you saw them?

A. [Appellant's daughter] was crying. They seemed scared. I could see there was fear in their eyes and shock.

Q. What was First Sergeant doing at that time?

A. He was standing in the doorway entry to his kitchen.

Q. Was he saying anything?

A. He was telling me to apologize.

Q. Did he do anything?

A. Not at this moment, sir.

Q. And, after he told you to apologize, what did you do?

A. I got on one knee and I apologized, sir.

Q. What did you actually say as an apology?

A. I said, "[appellant's daughter], [appellant's son], I'm sorry if I disrespected you or dishonored you in any way. Please accept my apology."

According to ▓▓▓▓▓ appellant told him to leave, hit him in the face, and kicked him as he left. On cross-examination, ▓▓▓▓▓ said: "I did not throw the flags in anybody's face." The cross-examination subsequently turned to ▓▓▓▓▓'s getting into appellant's truck:

Q. Okay. So you volunteered to apologize to his kids for something you don't know what happened?

A. Correct, sir.

Q. All, right. And, not knowing what happened but agreeing to apologize, you then get in the truck?

A. Yes, sir.

▓▓▓▓▓▓▓▓▓▓▓▓ gave his account of appellant's behavior to law enforcement officials; he also texted another NCO asking if he had ever had a physical altercation with appellant. In response, the other NCO, then-Staff Sergeant (SSG) ▓[7] disclosed an incident from 2020, when appellant loudly berated him in

---

[7] By the time of trial, he had transferred to the Space Force and attained the rank of Master Sergeant.

response to his children's Asian-based racial epithets toward appellant's child.[8] Master Sergeant (MSgt) ███ testified that he did not feel threatened by appellant's behavior, but he did say appellant calling him "racist" angered him. As for the rest of what appellant allegedly said, MSgt ███'s testimony was somewhat unclear. Appellant's testimony was relatively easier to follow, if not entirely exculpatory.[9]

Q. Do you recall saying to him, "You are a f---ing stupid moron?"

A. No. I called him a "moron," yes.

Q. Okay. But did you say, "You're a f---ing stupid moron"?

A. No. I said, "You look" – I said, "You look like a f---ing moron," when he jumped at me and was trying to fight me. . . . I was like "You look like a f---ing moron. Stop. I'm not trying to fight you."

. . . .

Q. Did you say to him "You and your family are f---ing racists"?

A. No. I called him a "racist."

. . .

Q. Did you inform your chain of command at the time about the incident with Master Sergeant ███?

A. Yes. My First Sergeant that was his neighbor actually came and saw me that night.

---

[8] This episode was the basis for The Specification of Charge IV, which read, "In that First Sergeant (E-8) Steven K. Wilson, U.S. Army, did, at or near Katterbach Kaserne, Germany, on or about 11 September 2020, wrongfully use provoking and reproachful words, to wit: 'You're a little f---ing b--ch,' 'You're a f---ing stupid moron,' and 'You and your family are f---ing racists,' or words to that effect, and wrongfully use provoking gestures, to wit: balling his fists and moving his face close, towards ███████████ U.S. Army."

[9] The government concedes the evidence only tended to prove that appellant said to MSgt ███ "You're a f---ing stupid moron," and "You and your family are racists," or words to that effect. The government also concedes that, absent this alleged speech, appellant's gestures were not provocative. This court appreciates reasonable concessions like these, for they reflect counsel's careful understanding of the record, and they facilitate judicial economy.

Q. Okay. And did you tell him what happened?

A. Yes.

Multiple other government witnesses testified, two of whom described appellant's admissions about assaulting ███.[10] Appellant also testified, denying ██████s allegations of kidnapping, communicating a threat, and assault - he otherwise acknowledged his ill-tempered countenance during the incident. As for ██████'s kidnapping allegation, appellant testified that he believed ██████ voluntarily accompanied him to his quarters to apologize to his daughter.

Before trial, the defense moved to compel the production of ██ an 11-year-old witness who was present at the flag football game. The parties agreed ██ would testify he saw ██████ rip the flag off the waist of appellant's son, push him down, and throw the flag in the face of appellant's daughter.[11] The defense argued that ██'s testimony tended to prove ██████ voluntarily accompanied appellant to apologize to his daughter; the defense also argued the testimony was relevant to mistake of fact (even if mistaken, appellant honestly and reasonably believed ██████ voluntarily accompanied him to apologize to his daughter because he had done something warranting it). The defense also emphasized that ██ was unrelated to appellant, and that unlike appellant's children, he would testify that he smelled alcohol on ██████'s breath at the game.

The military judge denied a defense motion to compel production of ██ finding his proffered testimony irrelevant and cumulative with expected testimony from appellant's children, whom the prosecution had agreed to produce. The military judge maintained this decision after a defense request to reconsider.

## LAW

We review cases for legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our court may affirm only such findings of guilty and the sentence as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. *United States v. Cole*, 31 M.J. 270, 272 (C.A.A.F. 1990).

---

[10] Before trial, the government notified the defense of its intent to call five witnesses other than ██████, who would essentially disclaim seeing any inappropriate behavior at the flag football game.

[11] Taken from the military judge's 3 April 2023 ruling on the defense motion to compel production.

The test for factual sufficiency "is whether, after weighing the evidence in the record and making allowances for not having personally observed the witnesses," we are "convinced beyond a reasonable doubt." [12] *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

The elements required to prove an Article 125 kidnapping offense are as follows:

(1) That the accused seized, confined, inveigled, decoyed, or carried away a certain person;

(2) That the accused then held such person against that person's will; and

(3) That the accused did so wrongfully.

Manual for Courts-Martial, United States (2019 ed.) [MCM], pt. IV, ¶ 74.b.

Appellant was charged with "seiz[ing], carry[ing] away, and hold[ing]" ▮▮ "Seize" means "to forcibly take possession (of a person or property), while "carry away" means "to take or move." Black's Law Dictionary 1480, 242 (9th ed. 2009). Additionally, appellant must have held ▮▮ against his will. "'Held' means detained," which must be more than a momentary or incidental detention. MCM, pt. IV ¶ 74.c. The holding also must be "against that person's will" which "means that the victim was held involuntarily." *Id.*; *see also Chatwin v. United States*, 36 U.S. 455, 464 (1946) ("the involuntariness of seizure and detention…is the very essence of the crime of kidnap[p]ing.") The involuntariness of the detention "may result from force, mental or physical coercion, or from other means, including false representation." MCM, pt. IV ¶ 74.c. "Evidence of the availability or nonavailability to the victim of means of exit or escape is relevant to the voluntariness of the detention, as is evidence of threats or force, or lack thereof, by the accused to detain the victim." *Id.*

---

[12] Because one of the convictions is for an offense that allegedly occurred before 1 January 2021, we review factual sufficiency under the law in effect before the National Defense Authorization Act for fiscal year 2021. Pub. L. No. 116-283, § 542(b), 134 Stat. 3611-12.

We agree with our sister service court that kidnapping is a general intent crime. *United States v. Corralez*, 61 M.J. 737, 743 (A.F. Ct. Crim. App. 2005); *see also United States v. McDonald*, 78 M.J. 376, 380 (C.A.A.F. 2019) (stating "general intent" requires "only the general intent to do the wrongful act itself"). But unlike the Presidentially enumerated offense of kidnapping under Article 134, UCMJ at issue in *Corralez,* which included an element that the accused acted *"willfully* and wrongfully," *see MCM*, 2016, pt. IV ¶ 92.c (emphasis added), Congress has since enacted kidnapping as an offense under Article 125, requiring the act be wrongful but omitting the "willfully" element. This makes it clear that kidnapping under Article 125, UCMJ is a general intent crime. Thus, as a general intent crime, the mistake of fact defense applied if appellant honestly and reasonably believed the victim acted voluntarily. R.C.M. 916(j). "The honest belief prong is subjective, while the reasonableness prong is objective." *United States v. Goodman*, 70 M.J. 396, 399 (C.A.A.F. 2011). Relevant to the third element of kidnapping, appellant must have held ████ without justification or excuse for his acts to be wrongful.

The elements required to prove an Article 117 offense are:

(1) That the accused wrongfully used words or gestures toward a certain person;

(2) That the words or gestures used were provoking or reproachful; and

(3) That the person toward whom the words or gestures were used was a person subject to the UCMJ.

MCM, pt. IV, ¶ 55.b.

Whether speech is provocative is subjective and depends on the reasonable reaction of the person to whom the words are addressed, not just the speaker's demeanor and the offensive nature of the words. *United States v. Killion*, 75 M.J. 209, 215 (C.A.A.F. 2016). The court considers case-specific facts to determine whether an objectively reasonable person could be expected to retaliate after hearing the stated words that, under other circumstances, could be provocative. *Id.*, (citing *United States v. Thompson*, 22 U.S.C.M.A 88, 90, 46 C.M.R. 88 (1972)).

The elements required to prove an Article 115 offense are:

(1) That the accused communicated certain language expressing a present determination or intent to injure the person, property, or reputation of another person, presently or in the future;

9

  (2) That the communication was made known to that person or to a third person; and

  (3) That the communication was wrongful.

MCM, pt. IV, ¶ 53.b.

The offense of communicating a threat contains both an objective and a subjective element. *See United States v. Rapert*, 75 M.J. 164, 168 (C.A.A.F. 2016) (holding that communicating a threat under the UCMJ "requires the government to also prove a *subjective element*, i.e. the accused's mens rea") (emphasis in original); *see also United States v. Olahprado*, ARMY 20220200, 2024 CCA LEXIS 170, at *41 (Army Ct. Crim. App. 9 April 2024) (mem. Op.).

"In all criminal prosecutions, the accused shall enjoy the right...to have compulsory process for obtaining witnesses in [their] favor...."[13] U.S. Const. amend. VI. "It is undeniable that a defendant has a constitutional right to present a defense." *United States v. Bess*, 75 M.J. 70, 74 (C.A.A.F. 2016) (citing *United States v. Dimberio*, 56 M.J. 20, 24 (C.A.A.F. 2001)). "Whether rooted directly in the Due Process Clause...or in the Compulsory Process or Confrontation clauses of the Sixth Amendment...the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Bess*, 75 M.J. at 74 (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). "Under the Compulsory Process Clause, a defendant has a 'right to call witnesses whose testimony is material and favorable to his defense.'" *Bess*, 75 M.J. at 75, (citing *Rock v. Arkansas*, 483 U.S. 44, 52 (1987)). "For constitutional errors, the Government must persuade us that the error was harmless beyond a reasonable doubt." *Bess*, 75 M.J. at 75 (citing *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002).

## DISCUSSION

At oral argument, government appellate counsel commendably acknowledged the unique circumstances of this "kidnapping" case and, when pressed, offered *United States v. Stefanek* for comparison. No. ACM 39895, 2021 CCA LEXIS 217 (A.F. Ct. Crim. App. May 5, 2021) (affirming a kidnapping conviction where appellant coerced his victim to stay in the room with him, under the threat he would commit suicide if she left, despite never threatening her directly). We do not question the wisdom of our sister service court's decision, but its underlying circumstances and charged act in furtherance of kidnapping are dissimilar from those here.

---

[13] R.C.M. 703 implements this right.

Based on our understanding of the law and what we view as the plain meaning of Article 125, this case demonstrates the centrality of involuntariness in a kidnapping prosecution. While there was testimony from ███ that he felt he had no choice but to go with appellant, we are not convinced beyond a reasonable doubt that appellant seized and carried away ███ and then held ███ against his will. ███'s own testimony acknowledged he "volunteered to apologize", and "agreeing to apologize, [he] then [got] in the truck[.]" Even if ███ was acting involuntarily, the evidence still raised a mistake of fact defense. That is, assuming arguendo ███ was acting involuntarily, appellant appeared to honestly and reasonably believe otherwise. While we are far from certain the kidnapping charge is legally sufficient, we do not need to answer that question, as we are certain it is not factually sufficient.

Additionally, the military judge erred in declining to require production of ██. His testimony was legally relevant, for it tended to prove that ███ had done something at the flag football game to prompt his offer to apologize. This testimony was materially relevant to multiple issues of voluntariness: whether ███ was acting voluntarily; or, if he was not, whether appellant honestly and reasonably believed he was.

██'s proffered testimony also was not cumulative as the content and perspective of ██'s proffered testimony were unique. Unlike appellant's children, whom the prosecution suggested were partial, ██ was an unrelated, apparently unbiased witness.

The parties helpfully point out the constitutional dimensions of the military judge's decision not to order production. Finding the military judge erred in denying compulsory production of a favorable witness, we assess whether the government has proven the error harmless beyond a reasonable doubt. As applied to the charged misconduct naming ███ as a victim, it was not harmless. Without ██'s testimony, appellant's case lacked favorable, relevant information about ██'s actual state of mind; it also lacked impartial testimony that would have impeached his credibility by contradiction. Such impeachment by contradiction would have tended to sow doubt about much of anything ███ said at trial. Appellant's admissions to other trial witnesses about slapping and kicking ███ eliminate any doubt he did so; if ███ were the only source of that information, we would likely set aside that guilty finding also. Because ███'s testimony was the sole evidence for appellant's conviction of communicating a threat, we are far from convinced beyond a reasonable doubt of that guilty finding.

Turning to appellant's convictions for provoking speech and gestures. The evidence amounts to somewhat conflicting testimony between MSgt ██ and appellant. Without appellant's account at trial, about all we would know is that he called then-SSG ██ a racist. MSgt ██'s testimony did not disclaim the

circumstances that apparently motivated appellant's anger toward him; Instead, there was nothing to contradict appellant's testimony that he believed then-SSG █'s children racially harassed his son or his description of then-SSG █'s physically aggressive behavior. We can hardly conclude beyond a reasonable doubt that, under the circumstances, appellant's word choice was provocative. Rather the "moron" comment appears to have worked to defuse then-SSG █'s physical aggression, especially when followed by appellant's words: "I'm not trying to fight you." As for the "racist" comment, it appears appellant's using it was not wrongful, at least based on his sincere perception of what his son experienced. For these reasons and considering the applicable legal standard, we are not convinced of appellant's guilt beyond a reasonable doubt.

## CONCLUSION

The findings of guilty for Charge I and its Specification, Charge III and its Specification, and Charge IV and its Specification are SET ASIDE. The finding of guilty for Charge II and its Specification is AFFIRMED. After reassessment, the sentence of no punishment is AFFIRMED. All rights; privileges; and property, of which appellant has been deprived by virtue of the findings set aside by this decision are ordered restored. See UCMJ arts. 58b(c) and 75(a).

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court