# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SCHENCK, ZOLPER, and WALBURN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Major CARL W. AXELSON, JR.**
**United States Army, Appellant**

ARMY 20020193

United States Army Southern European Task Force (Airborne)
Denise K. Vowell (arraignment) and Kenneth H. Clevenger (trial), Military Judges
Colonel Robert D. Teetsel, Staff Judge Advocate

For Appellant:  Major Charles L. Pritchard, Jr., JA (argued); Lieutenant Colonel Mark Tellitocci, JA; Major Allyson G. Lambert, JA; Captain Terri J. Erisman, JA (on brief); Colonel John T. Phelps II, JA; Lieutenant Colonel Kirsten V.C. Brunson, JA (on reply brief); Major Billy B. Ruhling II, JA; Captain Sean F. Mangan, JA.

For Appellee:  Captain Edward E. Wiggers, JA (argued); Colonel Steven T. Salata, JA; Lieutenant Colonel Theresa A. Gallagher, JA; Major Natalie A. Kolb, JA (on brief).

30 April 2007

------------------------------------
OPINION OF THE COURT
------------------------------------

SCHENCK, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, consistent with his pleas, of failure to obey a lawful general regulation and obstruction of justice, both on divers occasions, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934 [hereinafter UCMJ]. An officer panel sitting as a general court-martial convicted appellant, contrary to his pleas, of attempted premeditated murder,[1] attempted willful disobedience of a

---

[1] Appellant pleaded guilty to the lesser-included offense of aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm.  *See Manual for Courts-Martial*, *United States* (2000 ed.) [hereinafter *MCM*, 2000], Part IV, para. 43d(2)(b) and 54b(4)(a).  All references in this opinion are to

(continued . . .)

superior commissioned officer, willful disobedience of a superior commissioned officer on divers occasions (two specifications), and obstruction of justice on divers occasions, in violation of Articles 80, 90, and 134, UCMJ. The convening authority approved the adjudged sentence to a dismissal, confinement for seven years, and forfeiture of all pay and allowances. This case is before our court for review under Article 66(c), UCMJ.

Appellant raises several assignments of error; two—involving his lack of memory—merit discussion but no relief. Specifically, appellant asks our court to set aside the findings of guilty of attempted premeditated murder. First, appellate defense counsel assert relief is warranted because appellant's statements during the plea inquiry and subsequent defense evidence on the merits, including appellant's testimony, raised the defenses of partial mental responsibility and automatism. Furthermore, because the military judge did not explain or discuss these defenses with appellant, appellant's guilty pleas to aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm were not "knowing." Second, the defense asserts the military judge erred because he failed to sua sponte instruct the panel regarding the defense of automatism.

We disagree with both assertions of error. In so doing, we hold a military judge's responsibilities regarding affirmative defenses are limited to those listed in Rules for Courts-Martial [hereinafter R.C.M.] 916 ("Defenses") and 920 ("Instructions on Findings"), and to those recognized by this court and our superior courts. These responsibilities apply to guilty plea inquiries *and* to instructions in contested cases. We also hold partial mental responsibility is not a defense to aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm. The defense of partial mental responsibility rebuts a specific intent *mens rea* element, such as purposeful, knowing, or premeditated, which this offense lacks under the UCMJ.[2]

---

(. . . continued)
the *MCM*, 2000 edition, in effect at the time of appellant's trial, unless otherwise specified.

[2] *Compare MCM*, 2000, Part IV, para. 54c(4)(a)(i)–(iv) ("Assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm.") *with id*. at para. 54c(4)(b)(i)–(ii) ("Assault in which grievous bodily harm is intentionally inflicted.").

## I.  FACTS

Appellant pleaded guilty to aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm, in violation of Article 128, UCMJ.  Following trial on the merits for the greater charged offense, an officer panel convicted appellant of the attempted premeditated murder of his wife by repeatedly striking her about the head, face, and neck with a club (Charge I and its specification).

This charge arose after appellant beat his wife with a club while he and his family were in the hills overlooking Athens, Greece.  Although some inconsistencies regarding the facts were presented during trial on the merits, and despite appellant's initial statement to police—that two unknown individuals attacked his wife—it is undisputed that appellant was the attacker.  On 6 June 2001, at around 1800, appellant, his wife, and their two infant sons, three-month-old CA and fifteen-month-old JA, drove to the countryside near the Voulas Mountains to take photographs.  After appellant stopped the vehicle, his wife went around the vehicle to check on CA, who was in a car seat behind the driver.  Appellant took a baton from the driver's door and struck Mrs. Axelson several times.  At some point thereafter, bicyclists rode by while Mrs. Axelson lay on the ground beside the vehicle with appellant bent over his wife's body.

### Providence Inquiry

During the *Care*[3] inquiry, the military judge accurately explained to appellant the elements of aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm,[4] and appellant agreed his conduct satisfied each element.  Appellant admitted he beat his wife with a club, with unlawful force or violence, and he used the club as a means or force in a manner likely to produce death or grievous bodily harm.  The parties proceeded to discuss the factual predicate supporting this offense without the benefit of a stipulation of fact.

Appellant agreed he did bodily harm to his wife "with a certain weapon or a means or a force by repeatedly striking her about the face, head, and neck with a club," fifteen or sixteen inches long made out of solid wood.  The military judge reminded appellant:  "[Y]our counsel has indicated that you intend to raise a defense

---

[3] *United States v. Care*, 18 U.S.C.M.A. 535, 40 C.M.R. 247 (1969).

[4] *See* UCMJ art. 128(b)(1); *MCM*, 2000, Part IV, para. 54b(4)(a).

that essentially denies having what the law calls the *mens rea*, the specific intent to either premeditate as to a killing, to intend to kill, or to intend to deliberately or intentionally and purposely inflict grievous bodily harm.  Is that correct?" Appellant responded, "Exactly, sir."

After discussing with appellant the meaning of unlawful force or violence and grievous bodily harm, the type of weapon appellant used, how he used it, and the injuries Mrs. Axelson suffered, the military judge engaged appellant in the following colloquy:

> MJ:  Now, you struck this blow apparently repeatedly, is that right?
>
> ACC:  I do not remember that part, sir.  I remember once when I realized what was happening.
>
> MJ:  Have you heard or seen other reports or indications that there may have been more than one blow?
>
> ACC:  Considering I was the only person there, sir, and -- yes, sir.  I've seen reports.
>
> MJ:  You're satisfied then that[,] . . . [h]aving seen those reports, do you believe those are accurate descriptions of what has occurred to her, such that you believe that you did in fact[,] even though you might not personally remember it now, strike her repeatedly?
>
> ACC:  Yes, sir.

Subsequently, when describing the obstruction of justice offense (for reporting false information regarding the assault on his wife), appellant stated he parked the vehicle and his wife came around the vehicle to quiet their infant son, CA.  Appellant said he walked away, and when he "turned around, [CA] was quiet, and at that time, from what [he] was seeing, [he] believed that [CA] was in danger." He said he believed his wife was holding a pillow over CA's face, and, upon "seeing that," appellant became upset.  Appellant then told the military judge, "seeing that and getting upset is the point where [he could not] remember. . . ."[5]  From after that

---

[5] When asked about the concept of "defense of another," civilian defense counsel explained that appellant used more force than necessary to defend CA.  He also

(continued . . .)

4

point, the next thing [he could] recall [was his wife] on the ground and [him] hitting her and the sounds and the noise. And, at that point, [appellant] stopped."

Appellant admitted he read his wife's statement, which described him striking her with the baton/club repeatedly about the head, face, and neck, and believed her statement and report to be truthful. Appellant agreed he and his defense counsel discussed pleading guilty based on reports or statements without completely recollecting the offense. Appellant remembered seeing his wife holding a pillow over CA's head, but his next recollection was seeing his wife "laying on the ground" and "hitting her with the club or baton." The following discussion then ensued:

> MJ: There is a perception. There is a gap. The memory comes back to see her on the ground and he's hitting her, whether it's one of multiple blows, and then stops.
>
> ACC: Just one.
>
> MJ: After she's on the ground.
>
> ACC: Yes, sir.
>
> MJ: So, that's your recollection though?

---

(. . . continued)
stated he would forgo this defense regarding the greater offense of attempted premeditated murder during trial on the merits. The military judge properly explained and discussed with appellant "defense of another," and appellant told the military judge the defense did not apply because he used excessive force. We find no error in the military judge not instructing the panel on this defense. Appellant and his civilian defense counsel rejected this affirmative-defense instruction as part of their conscious, calculated, and well-reasoned presentment of appellant's guilty plea to the lesser-included offense of aggravated assault. *See United States v. Moore*, 12 U.S.C.M.A. 696, 700, 31 C.M.R. 282, 286 (1962); *United States v. Snyder*, 6 U.S.C.M.A. 692, 698-700, 21 C.M.R. 14, 20-22 (1956); *United States v. Gutierrez*, 63 M.J. 568, 573-74 (Army Ct. Crim. App. 2006) (stating record must demonstrate that foregoing required instructions represents "affirmative, calculated, and designed course of action"), *rev'd*, 64 M.J. 374, 375 (C.A.A.F. 2007) ("When [an affirmative] defense is reasonably raised by the evidence, the military judge is duty-bound to give an instruction, unless it is affirmatively waived. *See United States v. Wolford*, 62 M.J. 418, 422 (C.A.A.F. 2006).").

5

ACC:  That's all I can remember, sir.

At the end of the plea inquiry, appellant again affirmatively acknowledged to the military judge that he understood the elements of the offenses to which he was pleading guilty, the non-applicability of "defense of another," and had no questions regarding these elements.  Appellant also expressed satisfaction that each element accurately described his conduct pertaining to each offense, and reaffirmed that "defense of another" did not constitute a legal justification for aggravated assault— even though appellant originally perceived his son to be "in some potential mortal danger."

**Trial on the Merits**

Following the guilty plea inquiry, both parties presented extensive evidence on the merits regarding the contested offenses to which appellant pleaded not guilty—attempted premeditated murder, attempted willful disobedience of a superior commissioned officer, willful disobedience of a superior commissioned officer on divers occasions (two specifications), and obstruction of justice on divers occasions.

The evidence showed that on the evening of 6 June 2001, appellant drove his wife of one and a half years and their two sons to a scenic, yet secluded, mountainous region to take photos.  During the months leading up to the charged offenses, appellant had been engaging in an adulterous affair with "Maria," a Bulgarian national and freelance travel writer.

According to Mrs. Axelson, appellant stopped the vehicle in the shade at one point and told her to check on CA who was in a rear-facing car seat behind appellant.  Appellant said he saw "a little red spot" behind the child's ear. Mrs. Axelson went around the vehicle to CA's side, leaned into the vehicle, and checked CA's ears.

She further told the panel:

> My husband pinned me down, and at first, he was choking
> me with his hands, and then eventually with the baton, and
> then all of a sudden, he stopped.  While he was doing that,
> his facial expression totally deteriorated.  It wasn't like
> him at all.  When I looked in his eyes, I could see his toes;
> that's how much emptiness I saw.  It was like he was in a
> [trance], and like he didn't even recognize me.

Mrs. Axelson described the baton appellant used to attack her as a "black standard edition police nightstick."  She also told the panel that while appellant was striking

6

her, he said: "'You are driving me crazy,' and 'You are ruining my life and I just can't have it anymore.'" When appellant stopped the attack and "snapped out of it," he picked up his wife from the ground outside the vehicle and put her on the front passenger seat floor "curled up in a fetal position."

Appellant then drove with his family between fifteen and thirty minutes to their residence. When they arrived, appellant helped Mrs. Axelson from the vehicle up to their third-floor apartment using the elevator. He brought her inside, removed her clothing, put her in the bathtub, and briefly tended to her wounds. Appellant then went downstairs to get his two sons who were still in the truck. He put them in a playpen when he returned to the apartment. When appellant left to get the boys from the truck, Mrs. Axelson crawled to the telephone, called the U.S. Embassy, and told the receptionist she had "been beaten real badly" and to "send a doctor and the security folks." Initially, she did not remember that her husband was the assailant. Several days after the attack, Mrs. Axelson called the Air Force Office of Special Investigations (AFOSI) and told an agent she was afraid for herself and her two sons because appellant attacked her.

Doctor (Dr.) Trego, who treated Mrs. Axelson during the ambulance ride from a public to a private hospital, testified that due to the assault, Mrs. Axelson lost eleven of her thirty-two teeth, and suffered lacerations, swelling to her lips, and a torn gum line. She also had a bruised and fractured neck, and a crushed trachea (which would require forty pounds of steady force applied for twenty to twenty-five seconds). The victim sustained multiple anterior and posterior cerebral contusions resulting from "a significant degree of force." She also had multiple deep lacerations about the head and face (some down to the bone), resulting from "a significant amount of force" that "literally splits and separates the scalp." Mrs. Axelson also lost approximately four units of blood. Other testimony indicated appellant struck his wife at least eight or nine times with the baton.

In a 10 June 2001 written, sworn statement, appellant initially told investigators, in pertinent part, he stopped his truck to take family photos. He and his older son went for a walk—about 100 yards down the road from, and out of view of, the truck—to get clear photos of Sounio; meanwhile, his wife and younger son stayed near the truck in the shade. Appellant said he and his son immediately returned to the vehicle when he heard what sounded like screams. As he approached the truck, appellant saw one unknown man attacking his wife with a baton, while another was in the truck apparently searching for something. Appellant then got into a scuffle with the man attacking his wife and attempted to take the baton away from him. The man overpowered appellant, pushed him to the ground, and both unknown men fled the scene leaving Mrs. Axelson and the boys terrified and screaming. Appellant then tended to his hysterical wife's injuries. After calling out to some

7

bicyclists for help and deciding what to do next, appellant finally got the whole family into the vehicle and drove home.

During his testimony on the merits, appellant said when he and his family were driving in the mountains on the day of the assault, CA was "crying," his older son, JA, was "whimpering," and he told his wife: "I'm not going anywhere until you quiet [CA] down;" he then "walked away from the truck." When he did not hear CA crying anymore, appellant turned around and he "could see that [his wife] was holding . . . [an] aircraft pillow . . . over [CA's] head." Appellant said that seeing that, and hearing "no noise," made him become "just so scared." He further told the panel he "just [could not] remember what happened next," and "[t]he next memory [he had was of his] wife [on] the ground, and [he] was hitting her with the club, and [he] hit her in the mouth, and [he]'ll never forget the noise . . . and the blood." Later in his testimony, appellant reiterated: "[T]he first thing I remember is the sound, or hitting her in the mouth and the sound and just seeing that blood." Later, when the military judge asked appellant, "[A]re you certain in your own mind then that you at some point had the club in your hand?" appellant responded, "Yes, sir, because I can remember -- the first thing, the only thing I can remember at that point is actually going down and hitting her in the mouth . . . with the club."

Doctor (Major) Fey, a mental health clinical psychiatrist, subsequently testified for the defense and stated appellant has suffered from "obsessive/ compulsive [disorder (OCD)] . . . for most, . . . if not all[,] of his adult life." Appellant suffered from "generalized anxiety disorder [(GAD)] for a period of [six to seven] months prior to [attacking his wife]." Doctor Fey said appellant was a workaholic who was quiet, withdrawn, controlling, lacked self-esteem, generally did not find pleasure in life, and vomited to relieve stress. Civilian defense counsel then asked Dr. Fey the following questions regarding the defense strategy.

> Q. Well, and, again, to clarify for the court members what we're not raising here. We're not raising . . . an issue of mental responsibility at the time of the act.
>
> A. Right.
>
> Q. In terms of the classic sanity defense.
>
> A. . . . I do not believe he had any mental conditions that would effect his state of mind to be able to premeditate long term.
>
> Q. That would impair ---

8

A. Right. Exactly. . . . [W]hat I'm saying is that there's no psychotic disorder. I don't believe that his obsessive/ compulsive personality . . . , his generalized anxiety disorder affected his ability to premeditate from a long-term perspective . . . . [H]is mental state is not a very big issue.

. . . .

Q. Was he able to formulate the specific intent to kill at that time?

A. . . . He describes walking away from the car. At this point, he's irritable. Most people would probably be feeling frustrated, perhaps even angry and would recognize that.

. . . .

A. . . . I'm certainly not suggesting that Major Axelson assaulted his wife because his babies were crying; however, I think the jury must consider, considering that Major Axelson has testified that his wife put a pillow on top of the child's head, I think the jury must consider that it . . . could be an impetus to break open, from a metaphoric standpoint, a dam, so he turns around, the child is suddenly not crying. . . . I believe that the jury must consider that this was the impetus and that Major Axelson was in such a state of mind, perhaps rage, that he did not have the capacity to form the intent to kill his wife.

Q. Now, what about this, and I'm going to use the term amnesia, this period of time that he says he has no recollection of what he did?

. . . .

A. . . . I am not a lie detector. It is possible, and the jury must consider that Major Axelson is faking amnesia. Other alternatives are that *he had some medical condition, organic condition, that affected his ability to lay down memories.* I do not believe that that's an issue either. He

9

was not intoxicated. *He did not have any sort of seizure.*
He did not have a head injury, et cetera, so I don't believe
that there is any reason that he couldn't lay down
memories . . . . [Emphasis added.]

. . . .

A. . . . [T]he most important factors that I would consider
are, [first,] did his wife have a pillow in front of [CA]'s
face[,] because if she did not, I do not believe that there
would be such an impetus to bring about an attack of rage
like that. . . . The second thing is[,] did he premeditate for
longer than just seconds[,] because if he didn't, it comes
down to[,] did he premeditate for seconds or did he not
have the capacity to premeditate or form intent . . . . Also,
did he lure her up to that hill? Did he lure her out of the
car with a rash or was she attending to [CA] to pacify
him?

. . . .

A. . . . It's not certain to me why Major Axelson would
recall the last hit or part of the assault. That is not clear
to me. I think the fear that he was feeling then continued
into I would say a state of panic at that point. If you're
inclined to believe that Major Axelson is not faking
amnesia, at this point, he must have been a very confused
individual. His bleeding and battered wife is lying on the
ground. He has got a stick in his hand. At this point, I
think he was in panic mode.

. . . .

Q. . . . In fact, just within a few hours after his wife was
hospitalized, the evidence shows that he was communi-
cating with Maria [by email]. How . . . do you factor that
[into] his disorders you described, the obsessive/
compulsive disorder, the generalized anxiety disorder?

A: Well, I mean, if you're inclined to believe that he's
premeditated and that his plans were to kill his wife,
perhaps kill [CA], and establish some kind of life [with]
Maria, then one has to interpret those e-mails in that way,

> but if one is inclined to maybe, whether it's true or not, it doesn't surprise me that an individual[] that's generally relying on his relationship with Maria, and again, part is real, part is fantasy. It would not surprise me that that individual would be in contact as a means of dealing with his present problems.

During an Article 39(a), UCMJ, hearing held subsequent to Dr. Fey's testimony, the military judge denied trial counsel's request to release the full R.C.M. 706 sanity board report to the government for use in rebutting appellant's defense.[6] Civilian defense counsel again clarified the defense strategy, stating: "[W]e are putting on a defense to specific intent. It does not shift the burden to the defense . . . ." When the military judge asked, "If in my instructions, I were to limit the characterization of [your defense] to[: 'T]he evidence in this case has raised an issue [of] whether the accused had a character disorder[,'] would that suffice as an instruction in your view?" and "So, you're not seeking mental disease, defect, impairment, condition, deficiency, or behavior disorder?" civilian defense counsel agreed.

**Jury Instructions**

*Elements*

Prior to trial on the merits, the military judge told the jury, with civilian defense counsel's concurrence,[7] that appellant had "entered pleas of guilty" to:

---

[6] In response to the military judge's questions, civilian defense counsel agreed the defense was not pursuing a defense of mental disease, defect, impairment, condition, deficiency, or behavior disorder. *See* Military Rule of Evidence [hereinafter Mil. R. Evid.] 302(c) (authorizing release of full sanity board report to rebut defense of lack of mental responsibility); *see also United States v. Benedict*, 27 M.J. 253, 261 (C.M.A. 1988) ("[W]e conclude that a report from a sanity board established pursuant to . . . R.C.M. 706 . . . is not a report of 'opinions or diagnoses . . . kept in the course of a regularly conducted business activity' or that it 'was the regular practice of that business activity to make the . . . report.' *See* Mil.R. Evid. 803(6).") (fourth and fifth alterations in original).

[7] Since this a mixed-plea case, we must distinguish between facts appellant provided the military judge during the plea inquiry, and those he presented to the members in his testimony on the merits. During the providence inquiry, the military judge correctly explained, and appellant agreed, "that the elements or facts [he was]

(continued . . .)

(1) "the lesser[-]included offense [of] aggravated assault with a dangerous weapon or a means or force likely to produce death or grievous bodily harm" with respect to attempted premeditated murder (the Specification of Charge I); (2) obstruction of justice (redesignated as Specification 1 of Charge III); and (3) failing to obey a lawful general regulation (the Specification of Additional Charge II) for "wrongfully using his government computer and/or government internet access and/or electronic mail account for viewing, downloading, storing, transferring, sending, and receiving pornography."

The military judge further informed the panel:

> I conducted what the law calls a providence inquiry, and I've entered findings of guilty as to the Additional Charge II offense and Specification 1 of Charge III. The government is going to go forward and attempt to prove up the greater offense of attempted premeditated murder in Charge I and its Specification and go forward as [to] all the offenses for which Major Axelson has [pleaded] not guilty, and so those are the issues that are pending before you today, but the defense wanted you to know that he's [pleaded] guilty to that lesser[-]included offense in Charge I as well as to those other two offenses.

---

(. . . continued)

admitting . . . [regarding the] lesser[-]included offense of aggravated assault could be used by the government to assist them in proving up the attempted premeditated murder offense as it was originally charged." *See United States v. Gilchrist*, 61 M.J. 785, 794 (Army Ct. Crim. App. 2005) (citing *United States v. Caszett*, 11 U.S.C.M.A. 705, 707, 29 C.M.R. 521, 523 (1960) (stating guilty plea may "be used to establish facts and elements common to both the greater and lesser offense within the same specification")); *United States v. Ramelb*, 44 M.J. 625, 628-29 (Army Ct. Crim. App. 1996) (quoting *United States v. Dorrell*, 18 C.M.R. 424, 425 (N.B.R. 1954) ("It is long-settled judicial policy that while a plea of guilty constitutes a judicial confession of guilt to a particular offense and is considered the strongest proof of guilt under the law, such plea 'admits *only* what has been charged and pleaded to.' . . . [I]t may not be used to prove a separate offense.")); *but see United States v. Wahnon*, 1 M.J. 144, 145 (C.M.A. 1975) (stating guilty plea to one charge may not be used as evidence to establish separate charge to which plea of not guilty was entered).

The military judge provided the panel (upon its request) with tailored, written instructions regarding the elements of the contested offenses, and told the panel:

> The decision you have now is that the accused is presumed innocent. . . . And, you should also know that as to many of these offenses, and in particular this first offense, the attempted premeditated murder charge, there [are] a number of potential lesser[-]included offenses . . . . You know this much. That the accused [pleaded] guilty to a lesser[-]included offense of aggravated assault with a weapon[], means, or force likely to produce death or grievous bodily harm, in violation of Article 128[, UCMJ]. So, that's the bottom level, and that's already been established by his plea of guilty.

In advising the panel on the lesser-included offense of aggravated assault by *intentionally inflicting grievous bodily harm*, the military judge informed the panel:

> Now, as to the second element; that is, that the accused did so by repeatedly striking her about the head, face, and neck with a club, if you find the first element to be proven beyond a reasonable doubt, then the cause of those injuries as described in the second element has been established by the accused's provident plea of guilty to a lesser[-]included offense of aggravated assault with a weapon or a means or force likely to produce death or grievous bodily harm. . . . Additionally, the grievous bodily harm must have been intentionally caused by the accused . . . .

*Specific Intent and Premeditation*

The military judge told the panel it had to find appellant specifically intended to kill or injure his wife to find him guilty of certain lesser-included offenses other than the aggravated assault (with a dangerous weapon) to which appellant pleaded guilty. He also explained appellant presented evidence regarding his mental health to refute a specific intent *mens rea* element of the charged offense and the lesser-included offenses, and not as proof of a lack-of-mental-responsibility defense. The military judge also told the panel:

> [T]he evidence in this case has raised an issue about whether the accused has a character or personality disorder and the required state of mind with respect to the

13

offenses of attempted premeditated murder, attempted unpremeditated murder, attempted voluntary manslaughter, or aggravated assault by intentionally inflicting grievous bodily harm. You must consider all the relevant facts and circumstances in the evidence before you. One of the elements of these offenses is the requirement of premeditation of the design to kill, and the specific intent to kill [Mrs.] Axelson or the intent to kill her in the heat of sudden passion caused by adequate provocation or the specific intent to inflict grievous bodily harm.

An accused, because of some underlying character or personality disorder, may be mentally incapable of entertaining or formulating the premeditated design to kill, and/or the specific intent to kill a particular named person, here, [Mrs.] Axelson, or the intent to kill her in the heat of sudden passion caused by adequate provocation or the specific intent to inflict grievous bodily harm upon her. . . .

The burden of proof is upon the government to establish the guilt of the accused by legal and competent evidence beyond a reasonable doubt, [and,] unless, in light of all the evidence, you are satisfied beyond a reasonable doubt that the accused, at the time of the alleged offense for which you find him guilty[,] was mentally capable of entertaining or formulating . . . the specific intent to kill . . . [or] to inflict grievous bodily harm . . . , you must find the accused not guilty of any of those offenses or lesser[-]included offenses in Charge I and its Specification.

Now, this evidence was not offered to demonstrate or refute whether the accused is mentally responsible for his conduct. Lack of mental responsibility; that is, an insanity defense, is not an issue in this case. . . . You may consider evidence of the accused's mental condition before and after the alleged offense and its lesser[-]included offenses . . . , as well as evidence as to the accused's mental condition on the date of the alleged offense. The evidence as to the accused's condition before and after the alleged offense was admitted for the purpose of assisting you to determine the accused's condition on the date of the alleged offense.

14

## II.  GUILTY PLEA TO AGGRAVATED ASSAULT

Appellate defense counsel now assert appellant's guilty plea was improvident to aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm.  The defense argues appellant's statements during the plea inquiry and subsequent defense evidence on the merits, including appellant's testimony, raised the defenses of partial mental responsibility and automatism.  Appellant's guilty plea was not "knowing," the defense contends, because the military judge was required to, but did not, explain or discuss these defenses with appellant.  We disagree.

### Law

*Standard of Review*

To address appellant's assertion that his guilty pleas to aggravated assault were "not knowing," we must review the military judge's acceptance of appellant's guilty pleas for an abuse of discretion.  *United States v. Abbey*, 63 M.J. 631, 632 (Army Ct. Crim. App. 2006) (citing *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996)).  We will not overturn acceptance of the guilty pleas unless a substantial basis in law and fact for questioning those pleas exists in the record of trial.  *United States v. Adams*, 63 M.J. 223, 226 (C.A.A.F. 2006) (citing *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)).

A guilty plea inquiry must establish that the accused admits and believes he is guilty of the offense, and he must admit to factual circumstances that support the guilty plea.  *United States v. Firth*, 64 M.J. 508, 510 (Army Ct. Crim. App. 2006) (citing R.C.M. 910(e); *United States v. Simmons*, 63 M.J. 89, 92 (C.A.A.F. 2006); *United States v. Barton*, 60 M.J. 62, 64 (C.A.A.F. 2004); *United States v. Morris*, 58 M.J. 739, 742-43 (Army Ct. Crim. App. 2003)); *see United States v. Garcia*, 44 M.J. 496, 497-98 (C.A.A.F. 1996) (citing *United States v. Higgins*, 40 M.J. 67, 68 (C.M.A. 1994), and *United States v. Davenport*, 9 M.J. 364, 367 (C.M.A. 1980)).  "Mere conclusions of law recited by an accused are insufficient to provide a factual basis for a guilty plea."  *United States v. Outhier*, 45 M.J. 326, 331 (C.A.A.F. 1996) (citing *United States v. Terry*, 21 U.S.C.M.A. 442, 45 C.M.R. 216 (1972)); *United States v. Rokey*, 62 M.J. 516, 518 (Army Ct. Crim. App. 2005).

Failure to recall facts pertaining to an offense does not preclude an accused from pleading guilty, nor does it render improvident an accused's guilty plea.  *United States v. Moglia*, 3 M.J. 216, 218 (C.M.A. 1977).  If an accused "is convinced of his guilt[,] . . . personal awareness is not a prerequisite for a plea of guilty, but, rather, an inquiry must be made to ascertain if an accused is convinced of his own guilt.  Such a conviction . . . may be predicated on an accused's

assessment of the [g]overnment's evidence against him." *Id.* (internal citations omitted). As long as amnesia does "not preclude him from intelligently cooperating in his defense or taking the stand on his own behalf . . . [and] his amnesic condition [does not] impair his ability to rationally examine and assess the strength of the [g]overnment's evidence against him," an accused may knowingly and voluntarily plead guilty. *United States v. Barreto*, 57 M.J. 127, 130 (C.A.A.F. 2002) (internal citation omitted); *see also United States v. Proctor*, 37 M.J. 330, 336-37 (C.M.A. 1993) (military judge did not err by finding accused mentally competent to stand trial despite accused's delusional psychosis "that God would deliver him from being sentenced"); *United States v. Olvera*, 4 U.S.C.M.A. 134, 142, 15 C.M.R. 134, 142 (1954) (stating amnesiac "still quite competent to assume the witness stand, and to assure the court that he does not remember—and he is certainly able to analyze rationally the probabilities of his having committed the offense"); *Wilson v. United States*, 391 F.2d 460, 463-64 (D.C. Cir. 1968) (setting forth six factors to consider in assessing amnesic defendant's capacity to participate in fair and accurate trial). "When, as here, an accused cannot recall all of the circumstances surrounding his crimes, he may still plead guilty so long as he or she is personally convinced of his guilt and is willing to admit that guilt to the military judge." *United States v. Corralez*, 61 M.J. 737, 741 (A.F. Ct. Crim. App. 2005) (citing *Moglia*, 3 M.J. at 218), *pet. denied*, 63 M.J. 191 (C.A.A.F. 2006).

Nevertheless, if at any time during the proceeding, the accused sets up a matter inconsistent with the plea, "the military judge must either resolve the apparent inconsistency or reject the [guilty] plea." *Garcia*, 44 M.J. at 498 (citing UCMJ art. 45(a), and R.C.M. 910(h)(2)); *see also Davenport*, 9 M.J. at 367 (stating same). "In determining whether the providence inquiry provides facts inconsistent with the guilty plea, we take the accused's version of the facts 'at face value.'" *Gilchrist*, 61 M.J. at 791 (quoting *United States v. Jemmings*, 1 M.J. 414, 418 (C.M.A. 1976)); *United States v. Pajeaud*, 63 M.J. 644, 645 (C.G. Ct. Crim. App. 2006) ("The accused's . . . statements are taken at face value; their credibility is not part of the analysis.").

Additionally, if such "inconsistent matters 'reasonably raise[] the question of a defense . . . it [is] incumbent upon the military judge to make a more searching inquiry to determine the accused's position on the apparent inconsistency with his plea of guilty.'" *United States v. Estes*, 62 M.J. 544, 548 (Army Ct. Crim. App. 2005) (quoting *United States v. Timmins*, 21 U.S.C.M.A. 475, 479, 45 C.M.R. 249, 253 (1972)). Our superior court recently reaffirmed a military judge's "duty under Article 45, UCMJ, to explain to the accused the defenses that an accused raises during a providence inquiry." *United States v. Zachary*, 63 M.J. 438, 444 (C.A.A.F. 2006) (citing *United States v. Smith*, 44 M.J. 387, 392 (C.A.A.F. 1996)) (internal footnote omitted). If an accused's statements "during the providence inquiry suggest a possible defense to the offense charged, the trial judge is well advised to

16

clearly and concisely explain the elements of the defense in addition to securing a factual basis to assure that the defense is not available." *Jemmings*, 1 M.J. at 418; *see* R.C.M. 910(e). Short of volunteering "the facts necessary to establish a defense, if [an accused] sets up matter raising a possible defense, then the military judge is obligated to make further inquiry to resolve any apparent ambiguity or inconsistency." *United States v. Phillippe*, 63 M.J. 307, 310 (C.A.A.F. 2006). This inquiry, the *Phillippe* Court stated, is a necessary prerequisite to "determine[ing] whether the apparent inconsistency or ambiguity has been resolved." *Id*. Therefore, "when, either during the plea inquiry or thereafter, and in the absence of prior disavowals . . . circumstances raise a possible defense, a military judge has a duty to inquire further to resolve the apparent inconsistency." *Id*. at 310-11 (internal citation omitted). "The existence of an apparent and complete defense is necessarily inconsistent with a plea of guilty." *United States v. Shaw*, __ M.J.__, __, 2007 CAAF LEXIS 537, slip op. at 6-7 (C.A.A.F. 24 Apr. 2007).

The military judge's duty to resolve any inconsistencies continues throughout a court-martial proceeding, including during any trial on the merits regarding disputed charges. Article 45(a), UCMJ, requires: "If an accused . . . after a plea of guilty sets up matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently . . . a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty." Moreover, if, during presentencing evidence or trial on the merits, an accused subsequently presents matters inconsistent with his guilty plea, the military judge is required to reopen the providence inquiry to resolve the inconsistency or find the accused's plea improvident. *See Garcia*, 44 M.J. at 498 (citing UCMJ art. 45(a), and R.C.M. 910(h)(2)).

*Mens Rea and Actus Reus*

"Criminal liability is normally based upon the concurrence of two factors, 'an evil-meaning mind [and] an evil-doing hand. . . .'" *United States v. Bailey*, 444 U.S. 394, 402 (1980) (quoting *Morissette v. United States*, 342 U.S. 246, 251 (1952)). Essentially, criminal offenses consist of a mental component or *mens rea* as well as a physical component or *actus reus*. ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 831 (3d ed. 1982).[8]

---

[8] Strict liability offenses, however, impose criminal liability without a requisite *mens rea*, *scienter*, criminal intent, or state of mind, and "are exceptions to the general rule that criminal liability requires an 'evil-meaning mind.'" *Bailey*, 444 U.S. at 404 n.4.

A specific intent offense includes a *mens rea* element such as knowledge, intent, or premeditation. A general intent offense differs from a specific intent offense because "the former requires that the accused must have intentionally engaged in the prohibited conduct and not by mistake or accident. The latter requires that the accused must have acted with the specific purpose of violating the law." *Corralez*, 61 M.J. at 745 (citing *United States v. Gonyea*, 140 F.3d 649, 653 (6th Cir. 1998)).[9] In other words, proof of a general intent offense requires "that the defendant possessed knowledge with respect to the *actus reus* of the crime," i.e., knowingly engaged in the criminal act. *United States v. Carter*, 530 U.S. 255, 268 (2000). "A second rule of thumb is that a *mens rea* term ordinarily modifies the result and conduct elements in the *actus reus—e.g.*, the killing in murder, the sexual intercourse in rape, and the taking in larceny—but not the attendant circumstances." *United States v. Binegar*, 55 M.J. 1, 11 (C.A.A.F. 2001) (Crawford, C.J. dissenting) (quoting JOSHUA DRESSLER, UNDERSTANDING CRIMINAL LAW § 10.05 at 107 (1987)) (internal quotation marks omitted). "[T]hough many crimes do require some sort of mental fault (i.e., a bad mind), other crimes (which are commonly said to require *mens rea*) require only some sort of fault which is not mental. The unadorned word 'fault' is thus a more accurate word to describe what crimes generally require in addition to their physical elements." WAYNE R. LAFAVE, CRIMINAL LAW 224-25 (3d ed. 2000) (footnote omitted).

Nevertheless, "[b]ad thoughts alone cannot constitute a crime; there must be an act, or an omission to act where there is a legal duty to act." LAFAVE at 206. In assessing the physical component or *actus reus*, "[a] bodily movement, to qualify as an act forming the basis of criminal liability, must be voluntary." *Id.* It, therefore, follows that "[t]he deterrent function of the criminal law would not be served by imposing sanctions for involuntary action, as such action cannot be deterred." *Id.* at 208.

---

[9] We are mindful of the movement away from the traditional common law distinction between "general intent" crimes—requiring a general notion of *mens rea*—and "specific intent" offenses—requiring a specific mental state as an element. *Bailey*, 444 U.S. at 403-04. Instead, criminal statutes set forth a hierarchy of culpable states of mind—in descending order, purpose, knowledge, recklessness, and negligence—which has replaced the dichotomy of general/specific criminal "intents." *Id.* at 404. A purposeful or "intended" act occurs if the accused "consciously desires that result, whatever the likelihood of that result happening from his conduct," while a knowing act occurs when an accused is aware "that that result is practically certain to follow from his conduct, whatever his desire may be as to that result." *United States v. United States Gypsum Co.*, 438 U.S. 422, 445 (1978) (citation and internal quotation marks omitted).

*Assault with a Dangerous Weapon or Other Means or Force*
*Likely to Produce Death or Grievous Bodily Harm*

Aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm (as defined in the UCMJ) is an offense that does not include a specific intent *mens rea* element, but includes a physical component. *See* UCMJ art. 128(b)(1); *MCM*, 2000, Part IV, para. 54b(4)(a); *see also United States v. Redding*, 14 U.S.C.M.A. 242, 244, 34 C.M.R. 22, 24 (1963) ("Assault with a dangerous weapon . . . is not a specific intent offense. Rather, it is a general intent crime which may be committed even by a drunken assailant."). The requisite elements are:

> (i) That the accused attempted to do, offered to do, or did bodily harm to a certain person;
>
> (ii) That the accused did so with a certain weapon, means, or force;
>
> (iii) That the attempt, offer, or bodily harm was done with unlawful force or violence; and
>
> (iv) That the weapon, means, or force was used in a manner likely to produce death or grievous bodily harm.

*MCM*, 2000, Part IV, para. 54b(4)(a)(i)–(iv).

*Attacking Mens Rea: Partial Mental Responsibility*

Rule for Courts-Martial 916 sets forth special or affirmative defenses "which, although not denying that the accused committed the objective acts constituting the offense charged, den[y], wholly or partially, criminal responsibility for those acts." R.C.M. 916(a). These defenses include but are not limited to justification, obedience to orders, self-defense (including defense of others), accident, entrapment, coercion or duress, inability, ignorance or mistake of fact, and lack of mental responsibility. R.C.M. 916(c)–(k). An accused may also raise voluntary intoxication, *see* R.C.M. 916(l)(2), or partial mental responsibility (as discussed below)[10] to refute a specific intent *mens rea* element of an offense.

---

[10] Rule for Courts-Martial 916(k)(2) and discussion. "The [UCMJ] has never identified a defense of 'partial mental responsibility.'" *United States v. Mansfield*, 38 M.J. 415, 419 (C.M.A. 1993). But the *MCM*, 1969 (Rev. ed.), para. 120c., stated:

(continued . . .)

(. . . continued)

"*A mental condition, not amounting to a general lack of mental responsibility* (120*b*), which produces a lack of mental ability, at the time of the offense, to possess actual knowledge or to entertain a specific intent or a premeditated design to kill, *is a defense to an offense having one of these states of mind as an element*." (Emphasis added.) Thus, partial mental responsibility was recognized as a defense for the first time in the *MCM*, 1969. *See* Dep't of Army, Pam. 27-2, Analysis of Contents, Manual For Courts-Martial, United States 1969, Revised Edition, Chpt. 24 (28 July 1970) and cases cited therein. The *MCM*, 1984 became effective on 1 August 1984. Rule for Courts-Martial 916(k)(2) within the *MCM*, 1984 mirrored the language found in para. 120c. of the *MCM*, 1969. *See* Exec. Order No. 12473, 49 Fed. Reg. 17152 (Apr. 23, 1984). Subsequently, on 14 November 1986, Congress enacted Article 50a, UCMJ, ostensibly dispensing with the defense of partial mental responsibility. *See* National Defense Authorization Act for Fiscal Year 1987, Pub. L. No. 99-661, § 802(a)(1), 100 Stat. 3816, 3905 (codified in 10 U.S.C. § 850a(a)). On 9 March 1987, the President amended R.C.M. 916(k)(2) to reflect the enactment of Article 50a(a), UCMJ, indicating that partial mental responsibility *was not* a defense and prohibiting the admissibility of evidence of a mental condition not amounting to a full lack of mental responsibility "as to whether the accused entertained a state of mind" required for the offense. Exec. Order No. 12586, 52 Fed. Reg. 710 (Mar. 9, 1987); *see also United States v. Ellis*, 26 M.J. 90, 91-92 (C.M.A. 1988) (describing the history of this *MCM* change). In 2005, however, R.C.M. 916(k)(2) was modified yet again. *See* Exec. Order No. 13365, 69 Fed. Reg. 71333 (Dec. 3, 2004). Although the rule now states that "[a] mental condition not amounting to a lack of mental responsibility . . . is not an affirmative defense," R.C.M. 916(k)(2), the discussion states: "Evidence of a mental condition not amounting to a lack of mental responsibility may be admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense." *Id*. at discussion. Despite this R.C.M. 916(k)(2) discussion change— providing for partial mental responsibility (or "impaired mental state") evidence in the military—the United States Supreme Court recently determined that a state does not violate due process by barring mental responsibility defenses other than insanity (the "capacity to tell whether [a criminal act] . . . was right or wrong"), and prohibiting evidence to negate "the *mens rea*, or guilty mind," element (i.e., partial mental responsibility defense). *Arizona v. Clark*, __ U.S. __, __, 126 S. Ct. 2709, 2716 (2006). Consequently, partial mental responsibility remains in military practice a creature of executive enactment, and not a Constitutional requirement.

Rule for Courts-Martial 916(k) distinguishes between the defense of lack of mental responsibility at the time of the offense, *see* R.C.M. 916(k)(1),[11] and evidence that amounts to a defense of partial mental responsibility (or "diminished capacity"). *See* R.C.M. 916(k)(2) and discussion. With the former, "the defense bears the burden of proving, by *clear and convincing evidence*, that an accused was unable to appreciate the nature and quality or the wrongfulness of his offenses, *at the time he committed them*, because he suffered from a severe mental disease or defect, i.e., he lacked mental responsibility at the time of his crimes." *Estes*, 62 M.J. at 548-49 (citing UCMJ art. 50a(b); R.C.M. 916(k)(1) and (k)(3)(A)); *see United States v. Harris*, 61 M.J. 391, 399 (C.A.A.F. 2005) (Crawford, J., dissenting) (stating same); *United States v. Berri*, 33 M.J. 337, 343 (C.M.A. 1991); *see also Shaw*, __ M.J. at __, slip op. at 9 ("[T]he President has assigned the burden of proving lack of mental responsibility to the accused. R.C.M. 916(b)."). If, however, the defense presents evidence not amounting to lack of mental responsibility but negating a required *mens rea* element of the offense, i.e., the defense of partial mental responsibility, the defense does not bear the burden of proof. *See Berri*, 33 M.J. at 343 n.11; *Estes*, 62 M.J. at 549 n.4; *United States v. Pohlot*, 827 F.2d. 889, 897 (3d Cir. 1987).

In appellant's case, R.C.M. 916(k)(2) (2000 ed.), effective at the time of trial,[12] provided that except for the defense of lack of mental responsibility, partial mental responsibility or "[a] mental condition not amounting to a lack of mental responsibility . . . is not a defense, nor is evidence of such a mental condition admissible as to whether the accused entertained a state of mind necessary to be proven as an element of the offense." Despite this R.C.M. provision, in its 1988 *Ellis* opinion our superior court determined: (1) Article 50a(a), UCMJ (and its legislative history) mirrored the federal model and lacked Congressional intent to preclude such evidence; and (2) R.C.M. 916(k)(2) was of questionable Constitutionality. *Ellis*, 26 M.J. at 92-94. On these bases, the *Ellis* Court rejected R.C.M. 916(k)(2)'s ostensible dispensation with anything less than a complete defense of lack of mental responsibility, and held that an accused may present

---

[11] For the "affirmative defense of lack of mental responsibility at the time of the offense, there is no shift in burden and the defense bears the burden of proving each element of this defense." *Estes*, 62 M.J. at 549 n.4. Prior to trial on the merits, the defense must notify the government of "its intent to offer the defense of . . . lack of mental responsibility," R.C.M. 701(b)(2), and its intent "to introduce expert testimony as to the accused's mental condition." R.C.M. 916(k)(2) discussion.

[12] Appellant committed the charged offenses in June 2001, but was tried in March 2002. Therefore, the R.C.M. contained in the *MCM*, 2000 apply.

evidence of partial mental responsibility, or evidence of mental disease, defect, or condition to attack required *mens rea* elements of offenses such as premeditation, specific intent, knowledge, or willfulness. *Id*.; *see also Mansfield*, 38 M.J. at 419 (finding no error where military "judge omitted a phrase [in panel instruction] indicating that appellant need not be insane in order to qualify for the defense of partial mental responsibility"); *Berri*, 33 M.J. at 338 (agreeing with lower court in finding military judge erred by giving instruction that "effectively barred the members from considering the expert evidence on *mens rea*" element); *United States v. Tarver*, 29 M.J. 605, 609 (A.C.M.R. 1989) ("[W]hen the evidence establishes a mental condition which may negate an accused's ability to entertain a required *mens rea* element of an offense, the military judge must, *sua sponte*[,] instruct."); *Pohlot*, 827 F.2d. at 903 (rejecting "government's contention that the Insanity Defense Reform Act[, upon which Article 50a is modeled,] either explicitly or implicitly bars a defendant from introducing evidence of mental abnormality on the issue of *mens rea*"). Therefore, at the time of appellant's trial, the defense of partial mental responsibility—evidence such as relevant psychiatric testimony—negating an intent element was permissible.

Except for the lack of mental responsibility defense discussed previously, "[g]enerally, once the affirmative defenses listed in R.C.M. 916 are raised by the evidence at trial, the government bears the burden of proving beyond a reasonable doubt that the particular defense is not valid or has not been proven in a particular case." *Estes*, 62 M.J. at 549 n.4. The defense, however, may raise partial mental responsibility to negate a *mens rea* element without bearing the burden required for other affirmative defenses. *See Berri*, 33 M.J. at 343 n.11 ("As always, the factfinder determines whether *mens rea* has been proven. If admissible evidence suggests that the accused, for whatever reason, including mental abnormality, lacked *mens rea*, the factfinder must weigh it along with any evidence to the contrary."); *Pohlot*, 827 F.2d at 897 ("[U]se of expert testimony [to attack *mens rea*] is entirely distinct from the use of such testimony to relieve a defendant of criminal responsibility based on the insanity defense or one of its variants . . . .").

*Contesting Actus Reus: Automatism*

Appellant asserts his trial evidence raised the defense of "automatism," which is not a recognized special or affirmative defense listed in R.C.M. 916. Automatism, or the "unconsciousness defense," is viewed in terms of *mens rea* or *actus reus*, and "thus it may be considered as relieving criminal liability either because the [accused] lacks the mental state required for approval of a crime[, e.g., specific intent, willfulness, premeditation, or knowledge], or because the [accused] has not engaged in an act—that is, in a voluntary bodily movement." Eunice A. Eichelberger, Annotation, *Automatism or Unconsciousness as Defense to Criminal Charge*, 27 A.L.R.4th 1067, § 2 (1984) (current through January 2005). A state of

22

automatism renders a person who is capable of action "not conscious of what he is doing[, which is] equated with unconsciousness [or] involuntary action[, and] implies that there must be some attendant disturbance of conscious awareness." LAFAVE at 406 (citation omitted).

In asserting "automatism," those charged with an offense may contend they are not liable because they lack the mental state required by the criminal statute. *Id.* at 407. More correctly, an "automaton-defendant" asserts he is not guilty of an offense because his conduct was not a "voluntary bodily movement, and without [such] an act there can be no crime." *Id.* at 407-08 (internal footnote omitted). Voluntary acts do not include: "a reflex or convulsion; a bodily movement during unconsciousness[,] . . . hypnosis or . . . a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual." *Id.* at 408 n.25.

Essentially, in raising this defense, an accused asserts that at the time he committed the offense "he was unconscious or in an automatistic state or was subject to a physical state, such as an epileptic seizure, which ordinarily entails a loss, however temporary, of consciousness." 27 A.L.R.4th 1067, § 1a. Simply because an accused "suffers from amnesia and thus cannot remember the events in question," however, is not enough. LAFAVE at 407.

"Clinically[,] automatism or unconsciousness has manifested itself in epileptic and postepileptic states, clouded states of consciousness associated with organic brain disease, concussional states following injuries, schizophrenic and acute emotional disturbances, [and] metabolic disorders such as anoxia and hypoglycemia, [or] drug-induced loss of consciousness . . . ." 27 A.L.R.4th 1067, § 2. Therefore, some civilian courts generally recognize the automatism defense brought about by physical conditions such as epilepsy, stroke, or physical or emotional trauma. LAFAVE at 406. "Mere inability to remember an event, in and of itself, [however,] cannot establish automatism, since relevant inquiry involves the accused's knowledge and control at the time of the conduct, not at the time of trial." *Sellers v. State*, 809 P.2d. 676, 686-87 (Okla. Crim. App. 1991), *cert. denied*, 502 U.S. 912 (1991); *see also State v. Jenner*, 451 N.W.2d. 710, 721 (S.D. 1990) (holding defendant's statements, that she did not remember killing her daughter and that she slept through the night while the child died, "were inadequate to require jury instruction[] on" unconsciousness; "[A]mnesia . . . is not a defense to a criminal charge.").

23

Although "automatic" or involuntary conduct may fall into other defenses acknowledged in the military, as appellate defense counsel concede in their pleadings to this court, military courts have not recognized the defense of automatism.[13]  In 1991, our superior court recognized the defense of partial mental responsibility or "element rebuttal," but specifically stated:  "What the status of unconsciousness[, i.e., automatism,] might be under the [UCMJ], we do not decide here."  *Berri*, 33 M.J. at 341 n.9, 343.  Two years later, our court followed suit and, without recognizing the automatism defense, found an appellant's assertion that "he lacked the required *mens rea* due to automatic and uncontrollable behavior brought

---

[13] Military courts, however, have recognized that when offenses are committed during an epileptic seizure ("fugue" or "automatistic state"), an accused may be afforded a possible defense to criminal liability.  *See United v. Rooks*, 29 M.J. 291, 292-93 (C.M.A. 1989) (remanding case for further review and stating:  "[S]eizures attendant to epilepsy render an accused unable to form the *mens rea* required for conviction."), *aff'd*, 32 M.J. 25 (C.M.A. 1990) (summary disposition); *United States v. Smedley*, 15 U.S.C.M.A. 174, 175, 35 C.M.R. 146, 147 (1964) (noting trial testimony "indicated that the accused committed the offenses charged during an epileptic seizure, which rendered him incapable of meeting the standards laid down in military law for mental responsibility"); *Olvera*, 4 U.S.C.M.A. at 140-42, 15 C.M.R. at 140-42 (stating where amnesia is "rooted in some fundamental mental disorder[, for example, epilepsy,] existing at the date of the acts charged," an accused will "be able to raise the possibility that he was not mentally responsible at the time" he committed the offenses); *United States v. Johnson*, 3 U.S.C.M.A. 725, 730, 14 C.M.R. 143, 148 (1954) ("An epileptic seizure which produces an offense, would, of course, constitute a defense.").  An epilepsy defense must be based on

> some substantial evidence . . . tending to show that the accused was in an epileptic seizure when he performed the acts alleged, for a true epileptic seizure dethrones the reason and the condition precludes mental responsibility while it lasts.  Not only does the condition deprive the actor of self-control, it also robs him of the power to remember what occurred, and would probably deprive him of the capacity to distinguish right from wrong.  The characteristic effect is loss or clouding of the conscious-ness and automatic behavior, an impairment of all the functions which endow man with the capacity for rational action and choice.

*United States v. Burke*, 28 C.M.R. 604, 610 (A.B.R. 1959).

on by claustrophobia" to be without merit. *United States v. Campos*, 37 M.J. 894, 901-02 (A.C.M.R. 1993) (agreeing with government assertion that military judge was not persuaded the evidence "negated any intent elements of the offenses").

**Discussion**

Appellant now asserts his guilty plea to aggravated assault was not "knowing" because the military judge failed to explain or discuss the defenses of partial mental responsibility and automatism. Appellant contends these defenses were raised by his statements during the providence inquiry and during subsequent defense evidence on the merits, including appellant's testimony. We disagree and hold that regardless of appellant's statements and the defense evidence, the military judge had a responsibility to address only defenses recognized in the military justice system and defenses to the offenses to which appellant pleaded guilty.

First, partial mental responsibility was not a defense available to appellant because he pleaded guilty to aggravated assault with a dangerous weapon or other means or force likely to produce death or grievous bodily harm. This general intent offense under the code lacks a specific intent *mens rea* element, such as willfulness or premeditation. Since partial mental responsibility rebuts only a specific intent *mens rea* element, appellant could not have asserted that defense to aggravated assault, and the military judge did not have a responsibility to explain or discuss this defense with appellant. Thus, appellant's ostensible partial mental responsibility or diminished capacity did not render improvident his guilty plea to this type of aggravated assault. *See Berri*, 33 M.J. at 338 (agreeing that because panel was not allowed to consider psychiatric evidence rebutting *mens rea* element of specific intent crime—due to instructional error, lower court did not err by affirming "only a single, lesser-included, 'general intent' charge of assault with a dangerous weapon"); *United States v. Wall*, 15 M.J. 531, 534 (A.F.C.M.R. 1982) (citing *Redding*, 14 U.S.C.M.A. at 244, 34 C.M.R. at 24, and stating "assault with a dangerous weapon is a general intent crime").

Second, nothing appellant stated during his providence inquiry or on the merits suggested a possible defense to this aggravated assault. The military judge discussed with appellant the concept of "defense of another," and appellant aptly agreed it did not apply under the circumstances. The military judge was under no obligation to explore other potential defenses, i.e., automatism, not raised during the plea inquiry or on the merits. *See Phillippe*, 63 at 310-11 (stating that when "circumstances raise a possible defense, a military judge has a duty to inquire further"). Furthermore, automatism is not a defense listed in R.C.M. 916 or recognized by military law. Appellant did not show how, if at all, his amnesia or failure to remember his misconduct related to, or was part of, a greater physical condition amounting to a recognized defense, i.e., an epileptic seizure or other like

"automatistic state." 27 A.L.R.4th 1067, § 1a. On the merits, Dr. Fey testified that appellant exhibited what amounted to character or personality disorders—not any type of seizure at the time of the attack—and stated: "I do not believe [appellant] had any mental conditions that would [have affected] his state of mind to be able to premeditate . . . ." Moreover, although appellant said he could not remember a portion of the attack upon his wife, appellant was "personally convinced of his guilt," *Corralez*, 61 M.J. at 741, able to evaluate the government's evidence against him, and able to "intelligently cooperate[] in his defense." *Barreto*, 57 M.J. at 130. Therefore, we find nothing raised by appellant during the plea inquiry or on the merits inconsistent with his guilty plea.[14] Appellant's guilty plea to aggravated assault was "knowing." We now turn to appellant's averments regarding panel instructions.

## III. TRIAL ON THE MERITS

Appellate defense counsel now assert the military judge improperly instructed the panel regarding findings. The defense specifically argues that "[t]he military judge . . . instructed the panel that appellant's guilty plea admitted certain elements of the greater offense of attempted premeditated murder. The guilty plea allowed the panel to reject appellant's testimony on its face and conclude that the fact of an intentional act was already established." In attacking the *actus reus* element of appellant's guilty plea to aggravated assault, the defense states in its reply brief: "The issue whether appellant acted voluntarily was more fundamental than his specific intent . . . ." The defense also asserts the military judge erred when he failed to sua sponte instruct the panel regarding the defense of automatism. We disagree with both assertions.

### Law

*Instructions*

We review de novo the question of law regarding whether a military judge properly instructed court-martial members. *United States v. Simpson*, 60 M.J. 674, 680 (Army Ct. Crim. App. 2004) (citing *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003), and *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002)). We also review "the substance of any instructions given[] to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence." *United States v. Jenkins*, 59 M.J. 893, 897 (Army Ct. Crim. App. 2004) (citing *McDonald*, 57 M.J. at 20) (internal quotation marks omitted).

---

[14] *See Davenport*, 9 M.J. at 367.

Our superior court has recently held: "A military judge has a sua sponte duty to give certain instructions when reasonably raised by the evidence, even though the instructions are not requested by the parties." *Gutierrez*, 64 M.J. at 376; *see also United States v. Dacosta*, 63 M.J. 575, 582 n.8. (Army Ct. Crim. App. 2006) (discussing affirmative-defense instructions). Furthermore, when instructing panel members on findings, a military judge also "bears the primary responsibility for ensuring that mandatory instructions . . . are given and given accurately." *United States v. Miller*, 58 M.J. 266, 270 (C.A.A.F. 2003); R.C.M. 920(a) ("The military judge shall give the members appropriate instructions on findings.").

Required or mandatory instructions on findings include a "description of the elements of each offense charged[,] . . . each lesser[-]included offense in issue[, and] . . . any special [or affirmative] defense under R.C.M. 916 in issue." R.C.M. 920(e)(1)–(3). The discussion section accompanying R.C.M. 920(e) further explains: "A matter is 'in issue' when some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they choose." R.C.M. 920(e) discussion; *United States v. Dearing*, 63 M.J. 478, 484 n.20 (C.A.A.F. 2006) (citing R.C.M. 920(e)).

If the military judge has any doubt whether he should give an instruction on a lesser-included offense or special defense, he should resolve that doubt in favor of the accused. *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000) (citing *United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A. 1981)). "An accused does not waive his right to [an] instruction by failure to request it or by failure to object to its omission." *Gutierrez*, 64 M.J. at 376. A military judge, however, need not give a lesser-included offense or special defense instruction if "affirmatively waived by the defense" and "the [defense counsel's] statements signify that there was a 'purposeful decision' at play." *Id.* at 376-77.

*Prior Guilty Pleas: Informing Members and Use on the Merits*

In a case involving a mixed plea,

> in the absence of a specific request made by the accused on the record, members of a court-martial should not be informed of any prior pleas of guilty until after findings on the remaining contested offenses are made. This rule is long-standing and embodied in the [Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para. 2–5–4 (1 Apr. 2001)], R.C.M. 910(g), R.C.M. 913(a) and our decisions in [*United States v. Smith*, 23 M.J. 118 (C.M.A. 1986), *United States v. Rivera*, 23 M.J. 89

> (C.M.A. 1986), and *United States v. Davis*, 26 M.J. 445
> (C.M.A. 1988)].

*United States v. Kaiser*, 58 M.J. 146, 149 (C.A.A.F. 2003).  If an accused pleads guilty to a lesser-included offense, and the government intends "to prove the greater offense, findings should not be entered until after" trial on the merits, and the military judge should inform the court-martial panel "that if they find the accused not guilty of the greater offense and other contested lesser[-]included offenses, then they must enter a finding of guilty to the lesser[-]included offense to which the accused [pleaded] guilty."  *United States v. Baker*, 28 M.J. 900, 901 (A.C.M.R. 1989); R.C.M. 910(g)(2); R.C.M. 913(a); R.C.M. 920(e) discussion.

If the military judge accepts an accused's plea to a lesser-included offense, that guilty plea "may be used to establish 'facts and elements common to both the greater and lesser offense within the same specification.'"  *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001) (quoting *Dorrell*, 18 C.M.R. at 425-26). An accused's plea of guilty fulfills the elements of a lesser offense that can then be used to prove *common* elements of a greater offense to which the accused has pleaded not guilty.  *Id.* (holding "military judge did not err by considering appellant's admissions concerning the elements of the lesser-included offense of aggravated assault" in determining appellant was guilty of the greater offense of attempted premeditated murder).[15]  The military judge in a judge-alone trial, however, may not use admissions made during the plea inquiry elicited to prove elements contained in the greater offense to which an accused has pleaded not guilty.  *Id.*  Accordingly, the military judge should inform court-martial members, upon a specific request by an accused on the record, to accept as proven, *common* elements of the greater and lesser-included offenses the accused has admitted by his guilty plea.  R.C.M. 920(e) discussion; *see Grijalva*, 55 M.J. at 228; *Caszatt*, 11 U.S.C.M.A. at 707, 29 C.M.R. at 523; *United States v. Gray*, 51 M.J. 1, 25 (C.A.A.F. 1999) (finding court-martial can consider admissions made during state court guilty-plea proceedings).

*Elements of the Offenses*

Article 80, UCMJ, provides:  "An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending,

---

[15] This principle is equally applicable to cases tried before members.  In practice, however, members are not present when a military judge conducts a plea inquiry, and later receive appropriately-tailored findings instructions regarding an accused's guilty pleas.

even though failing, to effect its commission, is an attempt to commit that offense." UCMJ art. 80(a). Under the punitive articles section of the *MCM*, an attempt has the following requisite elements:

> (1) That the accused did a certain overt act;
>
> (2) That the act was done with the specific intent to commit a certain offense under the code;
>
> (3) That the act amounted to more than mere preparation; and
>
> (4) That the act apparently tended to effect the commission of the intended offense.

*MCM*, 2000, Part IV, para. 4b(1)–(4).

Article 118, UCMJ, provides: "Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he . . . has a premeditated design to kill . . . is guilty of murder." UCMJ art. 118. Under the punitive articles section of the *MCM*, premeditated murder has the following requisite elements:

> (1) *Premeditated murder*.
>
> > (a) That a certain named or described person is dead;
> >
> > (b) That the death resulted from the act or omission of the accused;
> >
> > (c) That the killing was unlawful; and
> >
> > (d) That, at the time of the killing, the accused had a premeditated design to kill.

*MCM*, 2000, Part IV, para. 43b(1)(a)–(d).

## Discussion

The panel convicted appellant of attempting to murder his wife, "with premeditation, *by repeatedly striking [her] about the head, face, and neck with a club*." (Emphasis added.) Prior to trial on the merits, the military judge properly informed the panel (with appellant's consent) that appellant pleaded guilty to

29

aggravated assault with a dangerous weapon as a lesser-included offense to attempted premeditated murder. He also told the panel the government was going to attempt to prove up the attempted premeditated murder charge. During the merits, the military judge commented to the panel: "So, [aggravated assault with a dangerous weapon is] the bottom level, and that's already been established by [appellant's] plea of guilty."

Before the panel withdrew to deliberate on findings, the military judge instructed the panel in pertinent part:

> In order to find the accused guilty of [attempted premed-
> itated murder], you must be convinced . . . beyond a
> reasonable doubt first, that . . . the accused did certain
> acts; that is, *repeatedly strike* [*his wife*] *about the head,*
> *face*[*,*] *and neck with a club* . . . .

(Emphasis added.) The military judge did not specifically describe the elements of the lesser-included offense of aggravated assault with a dangerous weapon or means or force likely to produce death or grievous bodily harm to which appellant pleaded guilty. After explaining the requisite specific intent elements for attempted premeditated murder, and the lesser-included offenses of attempted unpremeditated murder and attempted voluntary manslaughter—and how they differ for each offense—the military judge did cover the elements of aggravated assault by *intentionally inflicting grievous bodily harm*. When instructing on the elements of this lesser-included offense, the military judge told the panel:

> [A]s to the second element; that is, that the accused did so
> *by repeatedly striking her about the head, face, and neck*
> *with a club*, if you find the first element[—describing the
> injuries—]to be proven beyond a reasonable doubt, then
> the *cause of those injuries* as described in the second
> element *has been established by the accused's provident*
> *plea of guilty to* a lesser[-]included offense of *aggravated*
> *assault with a weapon or a means or force likely to*
> *produce death or grievous bodily harm*. . . .

(Emphasis added.) The military judge also reminded the panel that appellant pleaded "guilty to the next lower lesser[-]included offense of aggravated assault with a weapon, means, or force likely to produce death or grievous bodily harm"—a general intent offense not requiring any specific intent or premeditation.

We find the military judge properly instructed the panel regarding appellant's guilty plea to aggravated assault with a dangerous weapon or means or force likely

to produce death or grievous bodily harm as a lesser-included offense of attempted premeditated murder. Nothing in the military judge's instructions regarding appellant's admitted criminal act or *actus reus*, i.e., that he repeatedly struck Mrs. Axelson about the head, face, and neck with a club, was improper. By instructing the panel in this fashion, and based on the particular facts in this case, the panel could properly resolve the issue regarding appellant's specific intent at the time he committed the charged offense.

Appellant testified before the panel during the case on the merits—consistent with his plea inquiry admissions—that he "just [could not] remember what happened next," and "[t]he next memory [he had was of his] wife [on] the ground, and [he] was hitting her with the club, and [he] hit her in the mouth, and [he]'ll never forget the noise . . . and the blood." Later in his testimony, appellant reiterated: "[T]he first thing I remember is the sound, or hitting her in the mouth and the sound and just seeing that blood." Responding to the military judge's question, "[A]re you certain in your own mind then that you at some point had the club in your hand?" appellant responded, "Yes, sir, because I can remember -- the first thing, the only thing I can remember at that point is actually going down and hitting her in the mouth . . . with the club."

Doctor Fey testified that appellant exhibited what amounted to character or personality disorders; he suffered from "[OCD] . . . for most . . . of his adult life[,] . . . [and GAD] for a period of [six to seven] months prior to [attacking his wife]." Putting these disorders into perspective for the panel, Dr. Fey stated: "I do not believe [appellant] had any mental conditions that would [have affected] his state of mind to be able to premeditate long term. . . . [T]here's no psychotic disorder."

Doctor Fey further opined for the panel:

> I believe that the jury must consider that [Mrs. Axelson's actions were] the impetus[,] and that Major Axelson was in such a state of mind, perhaps rage, that he did not have the capacity to form the intent to kill his wife.
>
> . . . .
>
> [T]he jury must [also] consider that Major Axelson is faking amnesia. Other alternatives are that he had some medical condition, organic condition, that affected his ability to lay down memories. I do not believe that that's an issue either. He was not intoxicated. He did not have any sort of seizure. He did not have a head injury, et

cetera, so I don't believe that there is any reason that he
couldn't lay down memories . . . .

With respect to appellant's contention that he remembered only the tail end of the
attack, Dr. Fey commented: "It's not certain to me why Major Axelson would recall
the last hit or part of the assault."

As for the defense assertion that the military judge erred because he failed to
sua sponte instruct the panel regarding the automatism defense, we hold a military
judge's responsibilities regarding instructions on affirmative defenses pertain only
to those defenses listed in the R.C.M. and recognized in military law. Automatism
is not a defense listed in R.C.M. 916 or recognized by military law. Furthermore, a
military judge is under no obligation to explore potential defenses not raised on the
merits and not requested by the defense at trial. *See Phillippe*, 63 at 310-11 (stating
that when "circumstances raise a possible defense, a military judge has a duty to
inquire further").

Nevertheless, the evidence presented on the merits did not show appellant had
a diagnosed physical condition amounting to a recognized defense under military
law, or that appellant's lack of memory (amnesia) related to such a condition.
Despite appellant's faulty memory, the record demonstrates appellant believed and
admitted he was guilty of committing an aggravated assault with a dangerous
weapon upon his wife. He could also evaluate all the evidence against him, and
intelligently and meaningfully cooperate in his own defense.

## IV. CONCLUSION

We hold a military judge's responsibilities regarding affirmative defenses, in
both guilty plea and contested cases, are limited to those listed in R.C.M. 916 and
920, and to those recognized by this court and our superior courts. We also hold
partial mental responsibility is not a defense to aggravated assault with a dangerous
weapon or other means or force likely to produce death or grievous bodily harm. A
partial mental responsibility defense rebuts a specific intent *mens rea* element,
which this assault-type offense lacks under the UCMJ.

Moreover, the military judge properly instructed the panel regarding
appellant's guilty pleas. In any case, appellant's guilty pleas to the general intent
crime of aggravated assault with a dangerous weapon were knowing and voluntary,
and therefore, provident. Neither the plea inquiry nor the additional defense
evidence on the merits provided any "evidence that appellant's conduct was beyond
his control." *Sellers*, 809 P.2d. at 687. No evidence suggested a possible defense of
partial mental responsibility or automatism.

32

Even if automatism was a recognized defense in the military, "the evidence at trial could not have supported the [automatism] defense, [and] the trial court committed no error by [failing] to [sua sponte] instruct." *Id.* In sum,

> [w]hile we cannot characterize the accused's story as inherently improbable in any precise meaning of the term, we cannot avoid the conclusion that—even if accepted in every detail—the accused signally failed to link his amnesia [or lack of memory] to any type of automatism, or to demonstrate that the [brutally] executed [attack on his wife] was related in any way to a "mental defect, disease or derangement" depriving him of legal responsibility.

*Olvera*, 4 U.S.C.M.A. at 140, 15 C.M.R. at 140. Appellant has therefore failed in his attempt to convert his "amnesia into an unconsciousness [or automatism] defense." *Jenner*, 451 N.W.2d. at 721 ("[A]mnesia . . . is not a defense to a criminal charge.").

We have considered appellant's remaining assignment of error and find it without merit.

Accordingly, the findings of guilty and the sentence are affirmed.

Judge ZOLPER and Judge WALBURN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court